*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 13-CF-1130 & 13-CF-1132

OMAR V. ROLLERSON & ROLITA N. BURNS, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(CF3-10870-12)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued June 4, 2015                                    Decided December 17, 2015)

*Justin Murray*, Public Defender Service, with whom *James Klein* and *Alice Wang*, Public Defender Service, were on the brief, for appellant Omar V. Rollerson.

*Mindy A. Daniels* for appellant Rolita N. Burns.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Kendra D. Briggs*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, EASTERLY, *Associate Judge*, and BELSON, *Senior Judge*.

WASHINGTON, *Chief Judge*:   This case arises out of two altercations, taking

place on June 18, 2012, in which appellants Omar V. Rollerson ("Rollerson") and

Rolita N. Burns ("Burns") allegedly sought to identify and punish those responsible for slashing Burns's car tires. Appellants were charged with a series of crimes as a result of these incidents. After a joint jury trial, Rollerson was convicted of first-degree burglary while armed, assault with a deadly weapon, two counts of possession of a firearm during a crime of violence or dangerous offense, and two counts of felony threats. Rollerson and Burns were both convicted of assault with significant bodily injury ("felony assault"). Appellants filed timely notices of appeal. Appellants raise the following issues on appeal: (1) whether the trial court erred in denying Rollerson's motion to sever his trial from Burns's, in order to call her as a defense witness; (2) whether the trial court erred in denying Burns's motion to sever the counts arising from the first incident (Elvans Road) from the counts of the second incident (Bowen Road); (3) whether the evidence is sufficient to support appellants' convictions for significant bodily injury; and (4) whether Rollerson's two convictions for possession of a firearm during a crime of violence should merge. We affirm in part and reverse and remand in part.

**I.**

On December 5, 2012, Rollerson and Burns were charged by indictment with several criminal offenses arising from two incidents on June 18, 2012, in Southeast Washington, D.C. As to the first incident, which took place on Elvans Road, Rollerson was charged with: (1) first-degree burglary while armed (D.C. Code §§ 22-801 (a), -4502); (2) assault with a dangerous weapon (D.C. Code § 22-402) ("ADW"); (3) two counts of possession of a firearm during a crime of violence or dangerous offense (D.C. Code § 22-4504 (b)) ("PFCV"); (4) unlawful possession of a firearm by a felon (D.C. Code § 22-4503 (a)(l)) ("UF"); (5) carrying a dangerous weapon (D.C. Code § 22-4504 (a)) ("CDW"); and (6) threatening to injure or kidnap a person (D.C. Code § 22-1810) ("felony threats").

As to the second incident, which occurred on Bowen Road, both Rollerson and Burns were charged with: (1) assault with significant bodily injury (D.C. Code § 22-404 (a)(2) ("felony assault"); and (2) committing a crime of violence against a minor (D.C. Code § 22-3611). Rollerson was individually charged with another count of felony threats. Appellants' cases proceeded to trial before the Honorable

Patricia A. Broderick on July 9, 2013.[1] The jury found Rollerson guilty of first-degree burglary while armed, ADW, both PFCV counts, both felony threats counts, and felony assault, but acquitted him of CDW. The jury found Burns guilty of felony assault.

On September 29, 2013, the trial court sentenced Rollerson to 114 months in prison for first-degree burglary while armed, 30 months for ADW, 60 months for each PFCV conviction, and 14 months for each felony threats conviction. Rollerson was sentenced to 14 months for the assault with significant bodily injury arising out of the second incident. Rollerson's sentences for burglary, ADW, and PFCV were directed to run concurrently but consecutively to his sentence for the felony threats and felony assault. The trial court also sentenced Rollerson to five years of supervised release and a $100 fine for each conviction, totaling $700. Burns was sentenced to 18 months in prison, followed by three years of supervised release. The trial court suspended the execution of Burns's entire sentence and placed her on two years of supervised probation.

---

[1] The following charges were not submitted to the jury: (1) the UF charge against Rollerson and (2) the committing a crime of violence against a minor charges against Rollerson and Burns.

## II.

### A.  The Elvans Road Incident

On the night of June 17, 2012, Stefanie Harrington ("Harrington") and her friend Robert Teamer ("Teamer") were having drinks together in Harrington's apartment, located in the 2500 block of Elvans Road, Southeast.  Later that evening, Teamer and Harrington left the apartment and went outside to spend time with her neighbors.  At approximately 11:00 p.m., Teamer went back inside the building without Harrington, and fell asleep in her apartment.  At approximately 1:00 a.m. on June 18, 2012, Harrington saw her boyfriend and female friend outside and went out to engage them in conversation.  While she was outside, Harrington testified that she saw Burns standing by her car and overheard her stating loudly that someone had flattened the tires of her car.  Burns then went inside Harrington's apartment building and walked upstairs.   Not long thereafter, Rollerson came out of the apartment and approached Harrington and her friends.  Rollerson addressed Harrington's boyfriend first and asked him who had flattened their car tires.  Harrington's boyfriend stated that he did not know who had done it, to which Rollerson responded, "[O]h, you don't know, all right, I'm going to be back with the pump," which Harrington understood to be "his gun."

Harrington walked back inside the building and continued upstairs to her apartment. When she entered the building, she saw Burns coming back down the stairs and the two made eye contact. Harrington testified that Burns walked so close to her that she almost bumped into her. When Harrington stopped and turned around, Burns moved on but stated, "they better go in the house," which Harrington perceived as a threat. After hearing Burns's statement, Harrington testified that she went into her apartment and put a kitchen knife and an empty half-pint liquor bottle into her purse for her protection. While inside the apartment, Harrington told Teamer, who had been asleep, that she thought "there was about to be something" and wanted him to come outside to be a witness.

Harrington left her apartment, followed by Teamer, and saw Burns coming back up the stairs to the top level of the apartment where Harrington lived. Harrington approached Burns and said, ". . . so [w]hat you think I flattened your tires." Burns replied, "yeah" and stated that because she and Harrington were involved in verbal altercations in the past, Harrington may have been responsible for the damage to her tires. Burns and Harrington continued to argue until Rollerson came upstairs and intervened in the argument. At some point during the altercation, Harrington, Teamer, Burns, and Rollerson exited the apartment and moved outside

to the apartment parking lot.[2]   Harrington testified that after Rollerson saw the knife she had placed inside her purse earlier that evening, he asked her, "[W]hat you going to do with that?"   Harrington instructed Rollerson to back away from her and he complied.   When Rollerson retreated, Harrington tossed the knife down by a car. After Harrington threw the knife to the ground, Rollerson retrieved it and approached Harrington with it.   Rollerson continued to approach Harrington, until a man stopped him and held him back before he could reach her.   Harrington testified that Rollerson threw the knife at her, which hit her in the arm.   While Burns and Harrington were arguing, Teamer overheard Rollerson say, "[F]orget this, I'm about to go get that."   Teamer informed Harrington that he believed Rollerson intended to get a weapon, and the two left and walked up to Harrington's apartment.

Harrington and Teamer entered the apartment and locked the bottom lock on the door.   Harrington then went into her bedroom to look for another weapon. Teamer testified that shortly thereafter, the man who he had just seen earlier that night in the parking lot, "busted inside the door."   According to Teamer, Rollerson entered the apartment and stated, "I'm going to blow a hole in you guys," but was restrained again by the same person who had held him back earlier that night.

---

[2]   The transcript does not clearly reflect how this transition occurred.

Harrington testified that she heard a "big boom, like somebody busting in [her] door," and when she stepped out of her bedroom, she saw "Omar [Rollerson] with a shotgun." Harrington stated that she heard a noise, "like the impact of somebody being hit," and a scream. Harrington went into the living room and saw that Teamer's face was bruised, and Rollerson had left the apartment. Teamer testified that before Rollerson left, he had "poked" him in the face with the shotgun. Harrington and Teamer called the police following the incident. Harrington told police about the altercation and identified Rollerson as the man who entered her apartment with the shotgun. On cross-examination, Teamer testified that the man he saw in the parking lot was the same person who had come to the apartment door, but then indicated that Rollerson (as he appeared in the courtroom at trial) did not look like the same man who came to Harrington's door the night of the burglary.

**B. The Bowen Road Incident**

Later that day, at approximately 2:00 p.m., Burns approached 17-year old, Jasmine Patterson ("Patterson"), her boyfriend, her younger sister, and her cousins on the front porch of Patterson's apartment building at 2555 Elvans Road. Patterson testified that Burns approached the group and repeatedly asked if they knew who flattened her car tires. Patterson became upset because of the manner in which Burns approached her, which led to a verbal altercation between her and

Burns. During the argument, Patterson's stepfather and mother came outside and became involved in the dispute. Shortly thereafter, Rollerson turned to Burns and said, "F that, we're going to get Nellie and them," which Patterson took to mean, "he [was] going to get someone to come over where [she] live[d]" and fight them. Rollerson and Burns then walked off, got into a silver van and drove away. After Rollerson and Burns left, Jasmine and the rest of the group walked down Sheridan Road towards Patterson's grandmother's house. According to Patterson's testimony, when the group reached the intersection of Sheridan and Bowen Road, she saw Rollerson and Burns driving towards her. Both Rollerson and Burns exited the silver van, followed by five girls, whom Rollerson referred to as his nieces. Patterson testified that one of the girls yelled at the group as they walked, shouting, "F y'all Bs going? Come back. Fight us." Patterson stated that once the girls caught up with the group, one of the girls hit her and pulled her to the ground. While she was on the ground, she stated that Rollerson hit her in the face. Patterson was then hit with a log while she was on the ground. Patterson stated that Burns was standing off to the side for the majority of the physical altercation, but also hit her at some point during the fight. David Minor ("Minor"), Patterson's boyfriend at the time, arrived at the scene of the altercation and saw that Patterson had been injured. When Rollerson saw Minor approach, he warned him not to get involved or he was going to "get that out of the car and smoke [him]." Minor perceived that

statement as a threat that Rollerson would retrieve a weapon from the van. An older woman then exited the Sheridan Road apartment complex and threatened to call the police. Rollerson, Burns, and the five girls got into the silver van and drove towards Elvans Road. Patterson and the rest of the group continued on to her grandmother's house, where her grandmother called the police. Patterson spoke with the police when they arrived and was taken by ambulance to the hospital to receive stitches for the cut over her right eye. She received nine stitches in total. Patterson, her sister, and cousin Charnese identified Rollerson and Burns in a photo array as the two individuals involved in the incident.

## III.

Appellants challenge the trial court's denial of their respective severance motions and the sufficiency of the evidence to sustain their convictions for felony assault arising from the Bowen Road incident.

### A. Rollerson's Severance Motion

Rollerson argues that the trial court erred in denying his motion to sever his trial from that of co-defendant Burns. For the following reasons, we agree and reverse and vacate his convictions as to counts 1-4 and 6 of the jury verdict and

remand for a new trial.

Before trial, Rollerson filed a severance motion arguing that severance was warranted because Burns's ability to testify on his behalf was essential to his defense, as she would offer exculpatory evidence regarding the charges arising from the Elvans Road incident. Rollerson proffered that, if his severance motion were granted, Burns could testify at a separate trial that Rollerson was not present during the argument that led to the burglary and therefore did not make statements indicating he was going to retrieve a weapon and confront Harrington with it. The government opposed the motion, and argued that Burns's testimony was not substantially exculpatory because the government possessed other independent evidence (the testimony of Harrington) to prove that Rollerson was present during the previous altercation and committed the charged offenses. The government stated that it would be willing to stipulate to Burns's proposed testimony. Rollerson maintained that he would be severely harmed by his inability to call a live witness. The trial court denied Rollerson's motion, citing to the government's willingness to stipulate and Rollerson's ability to use phone records as adequate alternatives to Burns's live testimony. Ultimately, Rollerson chose not to present a stipulation of Burns's testimony, or the phone records at trial.

This court reviews a trial court's denial of a severance motion for abuse of discretion. *Hagans v. United States*, 96 A.3d 1, 40 (D.C. 2014). This court will reverse such a denial only if a defendant shows that he suffered "manifest prejudice" as a result of being tried jointly. *Harrison v. United States*, 76 A.3d 826, 834 (D.C. 2013). This court recognizes a presumption that persons jointly indicted together should be tried together. *Sousa v. United States*, 400 A.2d 1036, 1040 (D.C. 1979). The trial court should grant severance "'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Moore v. United States*, 927 A.2d 1040, 1056 (D.C. 2007) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). "[A]mong the specific trial rights that a motion for severance is intended to secure is the right to present a defense and call witnesses on one's own behalf." *Williams v. United States*, 884 A.2d 587, 593 (D.C. 2005).

### 1. Substantially Exculpatory Standard

Rollerson contends that the proposed testimony of Burns was substantially exculpatory under *Jackson*, and therefore required the trial court to grant his severance motion. Considering this court's case law, the fundamental right to a fair trial and the nature of the proposed testimony, we conclude the testimony had substantial exculpatory potential and the subsequent denial of Rollerson's motion to

sever was an abuse of discretion.

In deciding whether to sever based on a claim of exculpatory codefendant testimony, a court should consider: (1) the exculpatory nature and effect of the desired testimony; (2) the movant's desire to present the codefendant's testimony; (3) the codefendant's willingness to testify; and (4) the demands of judicial administration. *See Jackson v. United States*, 329 A.2d 782, 788 (D.C. 1974). The movant must "satisfy the court that the testimony would be exculpatory in effect and that the co-defendant is reasonably likely to testify." *Williams*, 884 A.2d at 594. In assessing the exculpatory nature of a codefendant's proposed testimony, the testimony need not prove actual innocence. *Id.* at 595-96. Accordingly, a court looks to how the proposed testimony, if credited by the jury, would prove or disprove charged offenses. *See id.*; *Martin v. United States*, 606 A.2d 120, 130 (D.C. 1991); *King v. United States*, 550 A.2d 348, 356-57 (D.C. 1988). A trial court should not rely upon credibility determinations of a codefendant's proposed testimony when assessing whether the testimony is substantially exculpatory as credibility determinations are reserved for the jury. *See Martin*, 606 A.2d at 129-30; *King*, 550 A.2d at 356.

Here, the trial court found that if presented, Burns's proposed testimony

would be "officially" exculpatory. Rollerson contends that this finding indicates that the trial court established the first prong of the *Jackson* analysis. We agree. Despite the government's assertion that this statement was unclear, we are satisfied that this finding by the trial court can be most plainly read to fulfill the first element of *Jackson*, that the proposed testimony was "exculpatory in nature and effect." *See Jackson*, 329 A.2d at 788. To establish the second and third elements, Rollerson proffered evidence that Burns would testify that Rollerson was not present in the parking lot during the altercation with Harrington and that she did not notify him of the altercation until the next morning. Additionally, Burns's attorney confirmed the veracity of the proffer and verified that Burns was willing to testify on Rollerson's behalf provided her trial was first.

Having presented sufficient evidence of the exculpatory nature of Burns's potential testimony and her willingness to testify, we hold that the proposed testimony was substantially exculpatory. This court has found similar codefendant testimony to be substantially exculpatory and remanded accordingly, where the proposed evidence directly negated motive, where the only other evidence of guilt was the testimony of the complaining witness or arresting officer, and where the denial of a severance motion was predicated on a credibility determination made before any co-defendant testimony was presented to the jury.

In *Martin*, an appellant was prevented from introducing the testimony of a codefendant who pled guilty before trial because the judge believed that the codefendant's alleged inconsistent statements indicated he would be "a most undependable witness." *Martin*, 606 A.2d at 126. Despite the inconsistencies and credibility flaws of the codefendant, this court determined that the testimony had substantial exculpatory potential because the nature of the proposed testimony went to the appellant's motivation for committing the charged offense. *Id.* Further, this court emphasized the importance of permitting the jury to hear such testimony because questions of credibility are reserved for the finder of fact. *Id.* at 129. By prohibiting the jury from hearing appellant's alternative theory for motive, presented through the testimony of the codefendant, this court found that the trial court erred and remanded for a new trial.

Additionally, in *Williams* this court concluded that co-defendant testimony was substantially exculpatory where the appellant and a codefendant were convicted of several weapons offenses after police officers discovered a handgun above appellant's seat in the course of a traffic stop. *Williams*, 884 A.2d at 589. Based on the sole testimony of an arresting officer that observed appellant lean forward in his seat, the government contended that appellant and codefendant had constructive

possession of the weapon and were both guilty of the weapons offenses. *Id.* at 592. This court found that the trial court abused its discretion by denying appellant's severance motion where appellant wanted to offer the testimony of the codefendant, the only other witness to the incident, to show that the appellant was never seen with the gun. *Id.* at 595-96. Though the trial court acknowledged the proposed testimony was exculpatory, this court found that it erred by failing to consider the relative weakness of the government case, which hinged upon the testimony of the police officer, when deciding to deny appellant's motion. *Id.*

Finally, in *King*, the appellant and a codefendant were convicted of unlawful distribution of PCP and marijuana. *King*, 500 A.2d at 350. At trial, a police officer testified to being sold narcotics by appellant and codefendant. *Id.* Appellant testified on her own behalf and denied any involvement in the sale of narcotics, claiming she was in the area to visit her child's school. *Id.* at 351. Arguing that the codefendant was the only person present at the transaction, besides the undercover officer, appellant's counsel maintained that the codefendant's testimony would be crucial to appellant's defense. *Id.* The trial court denied the motion to reopen. *Id.* This court remanded for a new trial holding that appellant was substantially prejudiced by the denial of the motion to reopen her case, as the co-defendant was the only other witness to the transaction. *Id.* at 357. Although

the government argued that the codefendant lacked credibility, this court determined the potential incongruences of the codefendant's testimony did not trump the defendant's right to present a witness in his defense that planned to testify to exculpatory evidence. *Id.* at 356.

For Rollerson, similar to the proposed testimony in *Martin*, Burns would have provided probative evidence of his intent and motive for committing the alleged offense had they been tried separately. *See Martin*, 606 A.2d at 122, 130. *Id.* at 126. By requiring a stipulation in place of live testimony, the trial court foreclosed on the jury's ability to hear from Burns and determine the credibility of her testimony and whether Rollerson lacked the motive to commit the alleged offenses stemming from the altercation at the apartment. In the present case, analogous to the court's analysis in *Williams* and *King*, the trial court does not appear to have considered the relative strength of the government's case in weighing the exculpatory nature of Burns's testimony, leaving the jury to rely solely on the testimony of the complaining witness to establish Rollerson's conduct during the Elvans Road incident. *See Williams*, 884 A.2d at 596.

Notwithstanding the extension of time and potential delay in retrying these cases severally, the demands of judicial administration do not outweigh Rollerson's

right to a fair trial. Similar to the court in *Williams*, the court's "concern for judicial efficiency" in this case cannot outweigh a criminal defendant's right to present exculpatory evidence on his behalf. *Id.* at 602. On these facts, we conclude that evidence proffered by Burns would have been substantially exculpatory under *Jackson* and constituted sufficient grounds for severing Burns's trial.

### 2. Stipulation as a Substitute to Live Testimony

Although the government contends that a stipulation as to the content of Burns's proposed live testimony would have been a sufficient alternative, this court has held that except in very limited circumstances, "a party may not be forced to accept a stipulation in lieu of testimonial or tangible evidence." *Daniels v. United States*, 738 A.2d 240, 251-53 (D.C. 1999) (abrogated on other grounds by *Wilson-Bey v. United States*, 903 A.2d 818 (D.C. 2006)); *see also Old Chief v. United States*, 519 U.S. 172, 188-90 (1997). In *Daniels*, the defense proposed stipulating to the content of a coroner's report in lieu of the medical examiner's live testimony. *Id.* at 249. The trial court declined to force the government to stipulate and this court affirmed that decision, reasoning that the medical examiner's live testimony also demonstrated that the murder was done intentionally with premeditation and deliberation. *Id.* at 252. Additionally this court concluded:

> Live testimony or tangible evidence offers so many significant advantages over a stipulation that we think it would be grossly unfair for a court to force a party to rely on the latter rather than the former, for a stipulation will almost never have the same probative value and persuasive power as the testimony of a live witness or a tangible object.

*Id.* at 251.

In *Daniels*, this court expressed more generally, that the substitution of live testimony for a stipulation was improper, primarily because of its inferior probative value. In this case, however, where the substitution was forced upon a criminal defendant, rather than the government, additional concerns about the fundamental right to a fair trial arise. It is well established that the right to call witnesses in one's defense carries significant constitutional implication and is a "fundamental element of due process of law." *Martin*, 606 A.2d at 127 (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)); *See King*, 550 A.2d at 353. The fundamental nature of this right necessitates "close scrutiny" of any action which has the effect of circumventing it. *See id.* In this case, Rollerson, a criminal defendant, was given one choice; to either accept a less probative stipulation in place of Burns's proposed testimony or to present no live witness testimony to prove motive or intent in his defense of the Elvans Road charges. Under the circumstances in this case, a new trial is necessary because of the trial court's decision to only permit a stipulation denied Rollerson the right to present exculpatory evidence regarding his motive

through Burns's live testimony, which if deemed credible, would have substantially exculpated him. *See Martin*, 606 A.2d at 127.

Here, the government contends that even assuming the trial court abused its discretion, any abuse was harmless in light of the weight of the evidence against Rollerson. This argument, however, is unpersuasive because the only evidence offered by the government placing Rollerson in the parking lot and in the apartment on the night of the incident was the testimony of the complaining witness, Harrington. Further, Teamer, the only other person who was present at both locations, did not positively identify Rollerson as the individual that committed the assault against him. Rather, Teamer testified that the man who was involved in the altercation at the car was the same man that assaulted him inside the apartment, but not the same man he saw in the courtroom on the day of trial. The government's case, therefore, rested upon the credibility of Harrington. In attempting to substitute Burns's live testimony with the proposed stipulation, the trial court denied the jury the benefit of weighing the credibility of Burns against Harrington and therefore prejudiced Rollerson's right to a fair trial.

In accord with the remedy given in *Martin*, *King*, and *Williams*, we remand Rollerson's convictions for a new trial in which his codefendant's testimony can be

introduced.  *See Williams*, 884 A.2d at 589; *Martin*, 606 A.2d at 129-30; *King,* 550 A.2d at 356.

**B.    Burns's Severance Motion**

Like Rollerson, Burns contends that the trial court erred in denying her severance motion because: (1) the majority of the charged conduct only related to Rollerson; (2) there were two separate incidents, one of which she was not charged for; and (3) trying her case with Rollerson's would result in prejudice.  The government opposed the motion, arguing Burns could not show that manifest prejudice resulted from a joint trial.  More specifically, the government contended that severance was not appropriate because the crimes arose from the same joint "crime spree" and the jury was capable of making and made independent determinations of guilt aided by court instruction.  The trial court denied Burns's motion, ruling that limiting instructions would be given to explain to the jury that evidence of the burglary and assault was admissible only in regards to Rollerson. During trial, Burns renewed her motion for severance, which was again denied.   We conclude that the trial court did not abuse its discretion in denying Burns's severance motion because she was not prejudiced by the joint trial.

This court will reverse such a denial only if a defendant shows that she

suffered "manifest prejudice" as a result of being tried jointly. *Harrison*, 76 A.3d at 834. "Manifest prejudice occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants." *Scott v. United States*, 619 A.2d 917, 930 (D.C. 1993). A defendant does not suffer manifest prejudice just because a significant portion of the government's trial evidence is applicable only to her codefendants. *Walker v. United States*, 982 A.2d 723, 729 (D.C. 2009). "This is so even though some of the evidence concerns prior criminal offenses or bad acts relating only to other codefendants." *Johnson v. United States*, 596 A.2d 980, 987 (D.C. 1991) (quoting *Payne v. United States*, 516 A.2d 484, 490 (D.C. 1986)). Thus, the inquiry is only whether the trial evidence is "so complex or confusing" that the jury could not make "individual determinations about the guilt or innocence of each defendant." *Id.* "It is accepted that in any trial involving multiple defendants, some amount of potential prejudice is permissible if outweighed by considerations of economy and expedition in judicial administration." *Payne v. United States*, 516 A.2d 484, 490 (D.C. 1986). "[T]he trial court's role is not to balance on a scale the comparative weights of the evidence as to each defendant." *Id.* The fact that a defendant would have had a better chance of acquittal had she been tried alone is not, by itself, grounds for concluding that severance was improperly denied. *Medley v. United States*, 104 A.3d 115, 123 (D.C. 2014).

Here, the trial court did not abuse its discretion in denying Burns's motion for severance because any prejudicial effect which resulted from her joint trial did not rise to the level of manifest prejudice necessary to require reversal. Burns's argument that severance was appropriate because her involvement in the Elvans Road incident was *de minimis* is unavailing. Although Burns was not charged with crimes arising from the Elvans Road incident, Burns played a central role in the events that led to Rollerson's crimes and her actions at that event show her motive to commit the assault later that day as she and Rollerson continued to seek out and punish the person who slashed her car tires. Thus, neither Burns's involvement in the Elvans Road incident nor her role in the "criminal enterprise" as a whole was *de minimis*.

Moreover, this is not a case that was "so complex or confusing" that the jury would have been unable to make "individual determinations about the guilt or innocence of each defendant." *Hagans*, 96 A.3d at 41. Indeed, throughout the trial and during closing arguments, both government and defense counsel reminded the jury that there were two separate incidents and that Burns was not charged with anything that happened on Elvans Road, only the assault that occurred on Bowen Road. Furthermore, during trial, after the government's presentation of evidence concerning the Elvans Road incident and before its presentation of evidence

concerning the Bowen Road incident, the trial court instructed the jury that "up to now all the evidence has been against Mr. Rollerson and the charges involving only Mr. Rollerson." And, during final jury instructions, the trial court parsed the offenses specifically against Rollerson from those against both Rollerson and Burns, made clear the location of each offense, and instructed that evidence for counts 1-6 relating to Rollerson for the Elvans Road incident could not be used in reaching verdicts as to counts 7 and 8 relating to the Bowen Road incident in which Burns was charged. These instructions properly protected Burns from manifest prejudice or improper use of evidence against her. *See Christian v. United States*, 394 A.2d 1, 20 (D.C. 1978) ("[A]n appellate court will be extremely reluctant to reverse [a trial court's denial of severance] on grounds of prejudicial joinder when the trial court has minimized the prejudice through the efficacious use of cautionary instructions."). Accordingly, we are satisfied that the trial court acted within its discretion when it denied Burns's motion for severance.

## C. Sufficiency of the Evidence for Felony Assault

Appellants allege that the evidence at trial was insufficient to support their convictions of felony assault. In reviewing a claim of sufficiency of the evidence, this court must determine, "whether, after viewing the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's

favor, and giving deference to the jury's right to determine credibility and weight, there was sufficient evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Blakeney v. United States*, 653 A.2d 365, 369 n.3 (D.C. 1995). The evidence need not "compel a finding of guilt" or negate "every possible inference of innocence." *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000). The government need only present some probative evidence on each essential element of the crime. *Jennings v. United States*, 431 A.2d 552, 555 (D.C. 1981).

Among the elements necessary to prove felony assault, the government must establish that the defendant caused "significant bodily injury" to another person, defined as "an injury that requires hospitalization or immediate medical attention." *In re R.S.*, 6 A.3d 854, 857 (D.C. 2010) (quoting D.C. Code § 22-404 (a)(2)). The threshold for such injury is "markedly less severe than that required for aggravated assault," and the focus "must be on the nature of the injury itself and the practical need in the ordinary course of events for prompt medical attention." *Id.* at 859. "Treatment of a higher order, requiring true medical expertise is required." *Quintanilla v. United States*, 62 A.3d 1261, 1265 (D.C. 2013)(internal quotations omitted).

Appellants claim that Patterson's injuries were not severe enough to constitute significant bodily injury. However, this court found in *In re R.S.*, that under similar circumstances, the victim suffered a significant bodily injury when she was attacked and her resulting injuries required four to six stitches in her ear. *See In re R.S.*, 6 A.3d at 859. In *R.S.*, the victim was attacked by the defendant and other juveniles, who punched and kicked the face and head of the victim and caused her to hit her head on a metal gate that cut her ear. The victim testified that the assault resulted in a "laceration to her ear, a bruise on her forearm, and a scratch on the back of her right shoulder." *Id*. at 857. This court concluded that "where the injury to the ear required four to six stitches and left a scar and where treatment was sought and administered with reasonable promptness, we have no difficulty in sustaining the trial court's conclusion that the injury met the requirement of the felony assault statute." *Id.* at 859.

In the present case, Patterson was injured in a violent group attack, in which Rollerson and Burns participated. After Patterson was "jumped," she was pushed to the ground, kicked and "stomp[ed] on," punched multiple times in the face, and hit in the head with a log. As a result, in addition to bruises and abrasions, she suffered "gashes to her face" going down to the "white meat," and was a bleeding "mess." She was taken to the hospital where she received care, including nine

stitches. The government placed into evidence photographs of her injuries from the hospital as well as medical records documenting her treatment. In light of the evidence of Patterson's injuries, we are satisfied that she suffered "significant bodily injury" for the purposes of felony assault and therefore affirm Burns's and Rollerson's felony assault convictions.

## IV.

For the foregoing reasons, we reverse the trial court's judgment denying Rollerson's severance motion, affirm his convictions on counts 7 and 8 of the jury verdict, vacate his convictions on counts 1- 4 and 6 of the jury verdict, and remand the case for a new trial on charges stemming from the Elvans Road incident. As a result, the issue of merger regarding Rollerson's PFCV convictions is mooted by the reversal of the aforementioned counts. As to Burns, we are satisfied both that the trial court did not abuse its discretion in denying her severance motion and that the evidence was sufficient to support her conviction for felony assault. Thus, we affirm her conviction on appeal.

*Affirmed in part and reversed and remanded in part.*