6 A.3d 854 (2010)
In re R.S., Appellant.
No. 08-FS-511.
District of Columbia Court of Appeals.
Argued January 19, 2010.
Decided October 28, 2010.
*855 Jennifer J. Bingham, appointed by the court, for appellant.
Janice Y. Sheppard, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Attorney General, were on the brief, for the District of Columbia.
Before REID and THOMPSON, Associate Judges, and STEADMAN, Senior Judge.
STEADMAN, Senior Judge:
At a juvenile bench trial, appellant was found guilty of so-called felony assault, carrying a pistol without a license, and related offenses[1] in inflicting wounds upon a victim that required four to six stitches on her ear and left scars visible seven months later. Appellant argues on appeal that these wounds did not constitute the requisite "significant bodily injury," defined by the statute as "an injury that *856 requires hospitalization or immediate medical attention." D.C.Code § 22-404(a)(2) (2010 Supp.). We conclude that the evidence presented here was sufficient such that the trial court could rationally find beyond a reasonable doubt that appellant committed felony assault. Appellant also argues that the evidence was insufficient in its proof of "operability" to support his conviction of carrying a pistol without a license. We disagree and affirm the judgment.[2]

I. Factual Summary
The charges against R.S. arose from an incident that took place in the late evening and early morning of June 25-26, 2007. Annette Foster was engaged in a fight with R.D. Leah Stover, who had been standing in front of her building, attempted to break up the fight. Foster testified that appellant ran toward Stover and kicked her below the waist, causing her to fall to the ground. After Stover fell to the ground, Foster observed appellant, D.B., A.B., and R.D., all of whom she knew from the neighborhood, begin to kick Stover repeatedly. While they were kicking Stover, Foster heard the juveniles threaten Stover, stating, "I'm about to fuck you up," and "bitches."
Stover herself testified that R.D. struck her cheek with his fist, after which appellant came from behind her and struck her in the face with his fist, causing her to stumble and fall. As she tried to get up, appellant hit her again in the face, which caused her to stumble again. A.B. and D.B. kicked her in the side of her face, and A.B. punched her. Appellant and the other boys kicked her many times, and as the boys struck her, they said, "I'm going to fuck you up," "bitches," and "fuck her up." Stover tried to fight back, but Foster was on top of her attempting to get the boys off of her. When the incident began to calm down, D.B. kicked Stover in the head, which caused her head to hit a metal gate and her left ear to "burst open." Foster then brought Stover into her second floor apartment.
While Stover and Foster were in the apartment, appellant and A.B. made multiple threats over the intercom in which they demanded that Foster let Stover out of the apartment. A.B. stated, "let that bitch out of the house. We don't want you. We just want her." R.S. stated similarly, "[w]e want your girlfriend, your friend to come outside, because we don't like her." Stover perceived that appellant was threatening her and encouraging her to come outside. Foster also heard the sound of someone cocking a gun. Stover looked through the peephole and saw A.B., D.B., and appellant in the hallway, and A.B. was holding a gun in his hand, "to the side," "like he was about to point at somebody."
At some point, for some reason, Stover did go outside. Tameka Phillips, her cousin, along with Phillips' sister, Shelly Clark, and a girlfriend, Tracy Washington, arrived to find Stover sitting on the curb with her head bleeding. Phillips saw appellant and A.B., neither of whom she knew, and asked them who hit her cousin. Appellant said, "I knocked her bitch-ass *857 out. If she want to act like a nigger, I'm going to treat her like a nigger." A.B. lifted his shirt, revealing his gun tucked into the front waistband of his pants, and threatened Phillips and the other two women, "I fuck you all bitches up. You all don't want it" and made other similar threats. Clark testified that A.B. made other threats to her and to others, including that he would pistol whip and smack them, and he pulled out the gun and held it at his waist but did not raise or point it. Phillips described appellant's actions as backing up A.B., stating, "yeah, you all don't want it, you all don't want it." Clark continued arguing with appellant and A.B. until the police arrived. After the police arrived, Phillips observed appellant and A.B. each ditch a gun that they had stored in the waistbands of their pants into the bushes. She then observed them run into the building. Despite the arrival of the police, several minutes later the boys exited the building, recovered the guns, and reentered the building.
Stover testified that because of the assault, she had a laceration to her ear, a bruise on her forearm, and a scratch on the back of her right shoulder. Foster observed that Stover's ear was "very swollen," and "torn in two," and that she could not hear out of that ear. Stover testified that on June 26, "right after the incident," she went to Greater Southeast Hospital, where she received four to six stitches in her ear and medication for her ear and for headaches that she suffered. Stover showed the court the scar that remained on her ear after the assault, and the court admitted into evidence photographs of the injury. Stover further testified that she experienced headaches for a couple of days after the incident. A week after the incident, she returned to the hospital to have the stitches removed.

II. Felony Assault and "Significant Bodily Injury"
The trial court stated in its findings that appellant's conviction for felony assault was based on (1) his participation in the assault when he kicked the victim to the ground, and (2) aiding and abetting the group of juveniles who collectively caused her injury. Appellant argues that there was insufficient evidence to support the conviction because Stover suffered what he terms only a minor injury to her ear that did not require hospitalization or immediate medical attention.
D.C.Code § 22-404 was amended by statute in 2006, adding subsection (a)(2), which created an intermediate assault offense. Section (a)(2) provides:
Whoever unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or recklessly causes significant bodily injury to another shall be fined not more than $3,000 or be imprisoned not more than 3 years, or both. For the purposes of this paragraph, the term "significant bodily injury" means an injury that requires hospitalization or immediate medical attention.
Prior to 2006, the range of assault charges was limited to simple assault, which carries a maximum penalty of 180 days imprisonment and a one thousand dollar ($1,000) fine, and aggravated assault, which carries a maximum penalty of ten years imprisonment and a ten thousand dollar ($10,000) fine. See D.C.Code §§ 22-404, -404.01 (2001 & 2007 Supp.). The "serious bodily injury" requirement under the aggravated assault statute creates a high threshold of injury. In Swinton v. United States, 902 A.2d 772 (D.C. 2006), we described the severity of the injuries that met this threshold:
The injuries in these cases usually were life-threatening or disabling. The victims *858 typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties. In short, these cases have been horrific.
Id. at 775.
In contrast to the high threshold of injury required and the substantial penalty incurred under an aggravated assault conviction, the charge of simple assault requires no injury and provides a maximum prison term of 180 days. D.C.Code § 22-404(a)(1) (2010 Supp.). We noted in Jackson v. United States that the D.C. Council had endorsed this court's "strict construction of the `serious bodily injury' requirement in the aggravated assault statute" when it amended D.C.Code § 22-404 by adding the intermediate felony assault offense to "`fill the gap between aggravated assault and simple assault.'" Jackson v. United States, 940 A.2d 981, 986-87 (D.C. 2008) (citing D.C. COUNCIL, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 16-247, at 6 (Apr. 28, 2006)). The original draft of the bill used the language "bodily injury," not "significant bodily injury." See OMNIBUS PUBLIC SAFETY ACT OF 2005, at 9, enclosed with LETTER FROM MAYOR ANTHONY A. WILLIAMS TO D.C. COUNCIL CHAIRMAN CROPP (Apr. 6, 2005). A letter commenting on the bill from the Public Defender Service of the District of Columbia addressed to the Judiciary Committee of the Council of the District of Columbia states that the "bodily injury" language was too minimal a requirement because it would make slapping or pushing a three-year felony offense. See LETTER OF THE PUBLIC DEFENDER SERVICE FOR THE DISTRICT OF COLUMBIA TO CHAIRMAN MENDELSON OF THE COMMITTEE ON THE JUDICIARY, at 12 (July 14, 2005). This letter recommended that the language be changed to "significant bodily injury," or something similar, that would be "more serious than mere `bodily injury' but less serious than `serious bodily injury.'" See id. The Council apparently incorporated this suggestion into the final bill, and in its April 28, 2006 report, noted that enhanced assault was intended to provide a penalty for assault that results in "significant (but not grave) bodily injury[.]" See supra REPORT ON BILL 16-247, at 5-6. The D.C. Attorney General also addressed the injury threshold in his testimony at a public hearing on the bill, in which he described the need for an intermediary felony assault to cover the "many assault cases involv[ing] a victim who has been seriously beaten, sometimes leaving the victim with black eyes, lacerations, broken bones, or serious bruising all over the body." See TESTIMONY OF ROBERT J. SPAGNOLETTI, ATTORNEY GENERAL, PUBLIC HEARING ON B16-247 THE OMNIBUS PUBLIC SAFETY ACT OF 2005, at 15 (May 31, 2005).
The statute contains a definition of "significant bodily injury" as one that "requires hospitalization or immediate medical attention." D.C.Code § 22-404(a)(2) (2010 Supp.). We have not hitherto had occasion to consider that definition in the context of the facts of a particular case. However, the very trial judge presiding in the case before us previously addressed that issue in a felony assault trial where the victim suffered a fractured nose with a deep gash and profuse bleeding with severe pain and a shoulder injury. See In re R.P., 136 Daily Wash. L. Rptr. 549 (D.C.Super.Ct. Feb. 19, 2008). In an extensive and careful discussion, Judge Byrd took note of the relatively moderate increase from simple assault to felony assault in fine ($1,000 to $3,000) and maximum term of imprisonment (180 days to 3 years), as compared to the much larger increase to aggravated assault with a fine of $10,000 and a ten-year term. See id. at *859 552. He concluded that an individual suffers significant bodily injury:
where there is an injury to the body ... that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is required where it is necessary to preserve the health and well being of the individual, e.g., to prevent long-term physical damage, possible disability, disfigurement, or severe pain.
Id.
We think this standard is a fair exposition of the Council's intent. Otherwise put, the threshold for significant bodily injury is markedly less severe than that required for aggravated assault. The fact that the injury here was not so grave as to require transport by ambulance to a hospital is not determinative. Indeed, the fact that the treatment happened to be administered at a hospital is not determinative whether hospitalization itself was "required,"[3] nor is a decision by the injured party not to seek "immediate" medical attention determinative as to whether the injury in fact called for such attention. The focus, instead, must be on the nature of the injury itself and the practical need in the ordinary course of events for prompt medical attention. Here, where the injury to the ear required four to six stitches and left a scar and where treatment was sought and administered with reasonable promptness, we have no difficulty in sustaining the trial court's conclusion that the injury met the requirement of the felony assault statute.[4]

III. "Operability"
Appellant challenges the sufficiency of the evidence to support his conviction for the offense of carrying a pistol without a license (CPWL) on the sole ground that the pistol involved in the incident was not proven to be "operable." Our case law establishes that to prove the offense of CPWL, the government must show that the pistol carried by defendant was operable. See, e.g., Strong v. United States, 581 A.2d 383, 387-88 (D.C.1990). Although this is often done by actual police tests, the pistol itself cannot be recovered in every case, and circumstantial evidence must then necessarily be used to prove operability. In assessing appellant's argument, we apply the well-established standard of review, viewing the evidence "in the light most favorable to the government, giving full play to the right of the [fact-finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." McCraney v. United States, 983 A.2d 1041, 1056 (D.C.2009) (quoting Curry *860 v. United States, 520 A.2d 255, 263 (D.C. 1987)).
In finding appellant guilty, the trial court observed that "[t]he testimony was that R.S. had a gun and that he, or he lifted his shirt and he was backing up A.B., A.B. with the cursing and the calling people bitches and all these foul language things that I heard ... and he even said things himself. But he had the gun, and that gun was used in such a manner that it portrayed to the people that they were talking to, if you step out here, you see what I got." Appellant in his brief does not contest the sufficiency of the evidence to support this characterization of the testimony, but asserts that the lifting of the shirt to display the gun, even though accompanied by threats, was insufficient to demonstrate operability. He argues that, as in Price v. United States, 813 A.2d 169 (D.C.2002), no evidence was presented that he raised or pointed the gun or otherwise affirmatively demonstrated his belief that it was operable. See id. at 173. However, while R.S. did not raise or point the gun, he did affirmatively make use of the gun by displaying it as part of his threatening conduct. The active reliance on the gun in a manner tending to show that it was operable makes this case somewhat more akin to precedents such as Peterson v. United States, 657 A.2d 756, 763 (D.C. 1995) (appellant waved gun containing shells in menacing manner), Bartley v. United States, 530 A.2d 692, 697-98 (D.C. 1987) (displaying a weapon to back up demands), and Morrison v. United States, 417 A.2d 409, 413 (D.C.1980) (robbery victim forced to lie on the floor by appellant, who stood above and pointed a gun at him). Even if the display of the gun might be insufficient in itself, there is the crucial additional fact that following the threatening encounter, the two boys ditched their guns but, notwithstanding the arrival of the police, elected to re-emerge from the apartment house and recover the weapons, an action unlikely to be chanced if they were inoperable. On the totality of the evidence here, we cannot conclude that the evidence of inoperability was insufficient to sustain the CPWL conviction.
Affirmed.
NOTES
[1] As discussed infra, felony assault is an intermediate level of offense greater than the misdemeanor of "simple" assault but less than "aggravated assault." D.C.Code §§ 22-404(a)(1), (2) -404.01 (2001 & 2010 Supp.). In addition to the offense of carrying a pistol without a license (D.C.Code § 22-4504(a)(1) (2001)), appellant was found guilty of possession of an unregistered firearm (D.C.Code § 7-2502.01(a) (2001)), possession of unregistered ammunition (D.C.Code § 7-2506.01 (2001)), possession of a prohibited weapon (D.C.Code § 22-4514(b) (2001)), and threatening to injure a person (D.C.Code § 22-1810 (2001)).
[2] Appellant also challenges the delayed production of a recording of 911 calls made from the scene, asserting that the failure to mention the presence of guns and the denial of the need for an ambulance constituted exculpatory material. However, the trial court itself as the finder of fact made it clear that the failure to mention guns would not be dispositive and was not that important or prejudicial. See Perez v. United States, 968 A.2d 39, 68-69 (D.C.2009). Moreover, as discussed infra, the need for an ambulance did not control the existence of a "significant bodily injury." Any failure to comply with D.C. Juv. R. 16 or 26.2 was harmless. See Ferguson v. United States, 866 A.2d 54, 65 (D.C.2005).
[3] It is not easy to envision a situation in which an injury might require hospitalization and yet not also require immediate medical attention. Perhaps the hospitalization definition, which is presented as an alternative, is to cover a situation where an injury is only latent and manifests itself a considerable time after the fact; e.g., an unrecognized internal injury or concussion.
[4] In Nixon v. United States, 730 A.2d 145, 150 (D.C.1999), we viewed the issue as whether, after viewing the evidence in the light most favorable to the government, a reasonable juror could find that the victim's injury met the serious bodily injury threshold for aggravated assault under a proper definition of such an injury. We defined such an injury as one involving "a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." Likewise, after addressing the legal question of what was intended by the "significant bodily injury" threshold, we apply here the same reasonable fact-finder standard used in Nixon.