# District of Columbia
# Court of Appeals

No. 13-CF-1170

DARIC M. WILSON,

F I L E D

JUN 30 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellant,

v.

CF2-2522-12

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BECKWITH and EASTERLY, *Associate Judges*; and BELSON, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's conviction of felony assault is reversed, an the case is remanded for the trial court to enter a judgment of conviction for simple assault.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: June 30, 2016.

Opinion by Associate Judge Corinne Beckwith.

Dissenting opinion by Senior Judge James A. Belson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1170

FILED 6/30/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

DARIC M. WILSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-2522-12)

(Hon. Stuart Nash, Trial Judge)

(Argued October 2, 2015                    Decided June 30, 2016)

*Daniel Gonen*, Public Defender Service, with whom *James Klein* and *Alice Wang*, Public Defender Service, were on the brief, for appellant.

*Uma M. Amuluru*, Assistant United States Attorney, with whom *Vincent H. Cohen Jr.*, Acting United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Damien Diggs*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and BELSON, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Dissenting opinion by *Senior Judge* BELSON at 18.

BECKWITH, *Associate Judge*:  After a jury trial, appellant Daric Wilson was convicted of one count of assault with significant bodily injury[1] stemming from a quarrel about a cab fare with Salim Abubakar, the driver.  As a result of this dispute, Mr. Abubakar sustained cuts and bruises to his face, experienced profuse bleeding, pain, and dizziness, and was eventually taken to the hospital.  On appeal, Mr. Wilson raises only a sufficiency challenge, contending that the government presented insufficient evidence that the cuts and bruises amounted to "significant bodily injury" under the statute.  We agree, and therefore reverse the conviction for felony assault and remand for the trial court to enter a judgment of conviction for the lesser included offense of simple assault.[2]  *See Quintanilla v. United States*, 62 A.3d 1261, 1262, 1266 (D.C. 2013).

## I.

On the evening of February 10, 2012, appellant Daric Wilson, his girlfriend, and a coworker named Jason Schneider hailed a taxi in the Crystal City area of Arlington, Virginia.  Mr. Wilson and his girlfriend had recently finished dinner and drinks, and they planned to spend the rest of the evening with Mr. Schneider and

---

[1]  D.C. Code § 22-404 (a)(2) (2012 Repl.).

[2]  D.C. Code § 22-404 (a)(1) (2012 Repl.).

some other friends in the Adams Morgan neighborhood of Washington, D.C.  Mr. Wilson and his companions got into Salim Abubakar's cab, and from here Mr. Abubakar's and Mr. Wilson's accounts diverge.

Mr. Abubakar testified that Mr. Wilson, who appeared to be intoxicated, gave him imprecise and confusing instructions about where he wanted to go in the District.  Mr. Abubakar explained that appellant eventually yelled at him to "stop, stop, stop" near the intersection of 18th Street and Florida Avenue, at which point the group exited the car.  Mr. Schneider then attempted to pay Mr. Abubakar the fare,[3] but Mr. Wilson grabbed Mr. Schneider's hand to prevent him from doing so while making comments that "[were] hurtful to [Mr. Abubakar] as a human being [and] that addressed [his] color and [him] in general as a human being."  Feeling afraid and threatened, Mr. Abubakar then got out of the cab and walked to an area behind it.  Mr. Schneider eventually succeeded in paying the fare, but as Mr. Abubakar was counting the money, Mr. Wilson walked up and punched him "on top of [his] left eye."  Mr. Abubakar said that he immediately started bleeding and "felt like [he was] really losing [his] eye," and he did not return the punch.  He also said that he felt dizzy.  Mr. Wilson then began choking him with his arm, and at

---

[3]  Mr. Abubakar testified that he never asked them to pay.

some point both men fell, with Mr. Abubakar landing on his face on the sidewalk.[4] On the ground, Mr. Wilson continued "holding [him] and stopping [him] from breathing," making Mr. Abubakar think he was "going to die." Mr. Abubakar testified that Mr. Wilson was quietly saying to him either "you will die" or "I will kill you." Eventually, Mr. Schneider intervened to restrain Mr. Wilson. With the conflict defused, Mr. Abubakar walked to a nearby wall, seeking support because he still felt dizzy. Paramedics soon arrived, took him to the ambulance, and eventually transported him to the hospital.

In Mr. Wilson's account, Mr. Abubakar, who seemed lost while driving through the District, "ignor[ed] [Mr. Wilson's] instructions [and] [went] in different, wrong directions" after explaining that he was not familiar with several of the locations Mr. Wilson suggested as a place to be dropped off—the Adams Morgan neighborhood, 18th and U Streets, or 18th and O Streets. Mr. Wilson therefore asked Mr. Abubakar to pull over and let the group out. After the passengers exited the car at the intersection of 18th and Florida, Mr. Wilson and Mr. Abubakar started arguing about the fare. Mr. Wilson testified that he refused to pay the full amount because Mr. Abubakar had gotten lost. Contrary to Mr.

---

[4] Mr. Schneider testified that he "heard him hit the ground; it didn't sound good." He also said that Mr. Abubakar's fall produced "kind of a dull thud" that "sounded like it hurt."

Abubakar's testimony, Mr. Wilson said that Mr. Abubakar, still in his car, insisted on the full fare while threatening to call the police. Mr. Wilson responded, "Great, call the police; I'll wait right here."

According to Mr. Wilson, Mr. Abubakar suddenly "lost it" and began screaming at him and the other passengers. When Mr. Abubakar left the cab, Mr. Schneider tried to pay him, but Mr. Abubakar quickly "got angry again." Mr. Abubakar then pushed Mr. Wilson, who pushed him back. This tussling happened "maybe a couple of times" before Mr. Abubakar "put[] his head down" and "[went] to tackle" Mr. Wilson. Mr. Wilson testified that he was "completely caught [] off guard," and that both men fell over, with Mr. Abubakar's face hitting the concrete. The two men grappled with each other on the ground, and Mr. Wilson grabbed Mr. Abubakar from behind to prevent him from flailing his arms and trying to hit him. After about twenty seconds, Mr. Abubakar had calmed down. Mr. Wilson consequently released him, reunited with his girlfriend and Mr. Schneider, and had begun walking away from the scene when the police arrived.

Two Metropolitan Police Department officers also testified as to the extent of Mr. Abubakar's injuries.[5] Officer Mark McGrail testified that when he arrived

---

[5] The government also presented the testimony of Sandy Pollock, who witnessed part of the incident from her second-floor apartment on the corner of

(continued…)

on the scene, Mr. Abubakar "appeared to be in visible pain" and "was bleeding from his face" and "gushing blood." Officer McGrail said he noticed "blood dripping on the sweater that [Mr. Abubakar] was wearing," and described this bleeding as "profuse[]"—ranking it a six on a scale of one through ten.[6] When he asked Mr. Abubakar what happened, Mr. Abubakar "moaned instead of responding." Officer McGrail testified that "you could just tell by his face that he was in pain." After the paramedics escorted Mr. Abubakar to the ambulance, he was treated there "for quite a while," possibly as long as half an hour.[7]

The second officer, Raeniel Castillo, testified that when he arrived on the scene, Mr. Abubakar "had cuts all over his face," "blood dripping down from his face onto his clothes," and "blood coming out of the injuries just pouring down his face." Mr. Abubakar "couldn't really talk that well," and "[a]t one point, his jaw

---

(…continued)

18th and Florida. Ms. Pollock testified that she heard a "very guttural, terrified scream," as if someone were "absolutely getting pummeled." Because her view was partly obscured, however, Ms. Pollock never actually saw anyone "strike the cab driver."

[6] On this scale, ten was considered the bloodiest.

[7] As for Mr. Wilson's injuries, Officer McGrail noticed "cuts" on the "back of his hands or on the knuckles." Officer McGrail characterized these marks as "offensive injuries," as they were located "in the striking area of the hand," and so he decided to arrest Mr. Wilson. Officer Castillo similarly testified that Mr. Wilson had cuts on his elbows and hands.

wouldn't move." Officer Castillo said the paramedics thought it might be broken, and they took Mr. Abubakar to the hospital after treating him in the ambulance. Officer Castillo characterized the volume of blood as a seven on a scale of one through ten.

The government presented no testimony from doctors or paramedics, but it did introduce into evidence a series of photographs taken when Mr. Abubakar was in the hospital. The photographs depict Mr. Abubakar in a hospital bed with lacerations and dried blood on his face, a brace around his neck, a cuff on his arm, and electrodes attached to his chest.

## II.

In reviewing a conviction on sufficiency grounds, "we consider all the evidence in the light most favorable to the government, according deference to the fact-finder 'to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact.'" *Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013) (quoting (*Devenn*) *Smith v. United States*, 899 A.2d 119, 121 (D.C. 2006)). We will reverse a conviction for insufficient evidence if the evidence "is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime." *Teneyck v. United States*, 112 A.3d 906, 908–09 (D.C. 2015) (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C.

2001) (en banc)).

## III.

The District's felony assault statute provides that "[w]hoever unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or recklessly causes significant bodily injury to another shall be fined . . . or be imprisoned not more than 3 years, or both." D.C. Code § 22-404 (a)(2) (2012 Repl.). The statute defines "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention." *Id.* To satisfy this statutory definition, the "immediate medical attention must be aimed at one of two ends— 'preventing long-term physical damage and other potentially permanent injuries' or 'abating pain that is severe instead of lesser, short-term hurts.'" *Teneyck*, 112 A.3d at 909 (quoting *Nero v. United States*, 73 A.3d 153, 158 (D.C. 2013)). This standard is objective. We ask "not whether a person in fact receives immediate medical attention but whether medical treatment beyond what one can administer himself is immediately required to prevent 'long-term physical damage, possible disability, disfigurement, or severe pain.'" *Id.* (quoting *In re R.S.*, 6 A.3d 854, 859 (D.C. 2010)). In other words, the statute does not extend to injuries that, "although seemingly significant enough to invite medical assistance, do not actually 'require' it, meaning the victim would not suffer additional harm by failing to receive

professional diagnosis and treatment." *Quintanilla*, 62 A.3d at 1265. The "treatment" required, moreover, is "not satisfied by mere diagnosis." *Id.* at 1264–65. Nor are "everyday remedies"—such as "ice packs, bandages, and self-administered over-the-counter medications"—"sufficiently 'medical' to qualify under the statute." *Id.* at 1265. Rather, any treatment must be "of a higher order, requiring true 'medical' expertise." *Id.*

Although D.C. Code § 22-404 (a)(2) remains a relatively new provision,[8] this court in recent years has started to define its contours. The court held, for instance, that there was sufficient evidence of significant bodily injury where a victim was shot "at close range" and the bullet penetrated his bicep, "causing 'obvious pain' and bleeding." *Nero*, 73 A.3d at 158. In reaching this conclusion, the court highlighted the complainant's doctor's testimony that such a wound can prove "life-threatening" and that, without treatment, the complainant "probably

---

[8] The Council of the District of Columbia enacted the statute in 2006 in order to "fill the gap" between simple assault, a misdemeanor that requires no physical injury and carries a maximum penalty of 180 days imprisonment, and aggravated assault, a felony that requires "serious bodily injury" and provides for a maximum term of ten years imprisonment. *Quintanilla*, 62 A.3d at 1263 (quoting *Jackson v. United States*, 940 A.2d 981, 987 (D.C. 2008)); *see also* D.C. Code § 22-404 (a)(1) (2012 Repl.) (simple assault); D.C. Code § 22-404.01 (2012 Repl.) (aggravated assault). In its committee report describing this new intermediate level of assault, the D.C. Council explained that it intended "to provide a penalty for assault that results in 'significant (but not grave) bodily injury.'" *Quintanilla*, 62 A.3d at 1263–64 (quoting *In re R.S.*, 6 A.3d at 858).

would have had a higher chance of wound infection"—evidence demonstrating a risk of long-term physical damage. *Id.* The court likewise held that there was sufficient evidence under the statute where the complainant's head was kicked into a metal gate, causing her ear to "burst open" and leaving it "torn in two," which prevented her from hearing out of that ear. *In re R.S.*, 6 A.3d at 856–57, 859. At trial, the complainant testified that she went to the hospital after the incident, receiving four to six stitches in her ear and medication for her ear and for headaches, which she experienced for several days following the assault. *Id.* at 857, 859. More recently, the court found sufficient evidence where the complainant's head was "repeatedly slammed" into the ground, resulting in "multiple abrasions and bruising all over her body, including trauma around her eye." *Blair v. United States*, 114 A.3d 960, 964, 980 (D.C. 2015). While it acknowledged that "not every blow to the head in the course of an assault necessarily constitutes significant bodily injury," the court underscored testimony from the complainant's doctor that he was "concerned" that she had a "significant head injury," which prompted him to "order[] a CAT scan and X-ray of her head and neck to determine whether she sustained internal injuries." *Id.* at 979–80.

In contrast, this court determined that there was insufficient evidence of significant bodily injury where the complainant—a robbery victim—received cold compresses from EMTs but no medical treatment. *Quintanilla*, 62 A.3d at 1263,

1265. The EMTs simply "checked [the victim] out" onboard an ambulance, taking pictures of her head where she had been hit and examining her for a concussion. *Id.* at 1263. The victim reported "no long-term effects" besides "a week and a half" of headaches, "swollen fingers 'for about three weeks,' and two months of an 'almost unusable' index finger." *Id.* at 1265. The court also found insufficient evidence of significant bodily injury where a bullet "merely grazed" the complainant's skin and the only medical treatment administered was "diagnostic tests, pain medication, and wound care." *Nero*, 73 A.3d at 159. Central to our conclusion was testimony from the complainant's treating physician, who explained that if the complainant had not been treated, "'probably not much' would have happened, and that he 'would have had pain, he would have needed pain medication and perhaps wound dressing.'" *Id.* This court similarly found insufficient evidence where at least one shard of glass was lodged in the complainant's hand but where stitches were unnecessary and the government failed to produce evidence that the complainant would suffer long-term physical damage as a result of the incident. *Teneyck*, 112 A.3d at 910–11.

## IV.

On appeal, Mr. Wilson contends that the government presented insufficient evidence that Mr. Abubakar suffered a significant bodily injury within the meaning

of D.C. Code § 22-404 (a)(2). Mr. Wilson asserts that the pain, dizziness, and extensive bleeding Mr. Abubakar experienced do not qualify under the statute given the government's failure to show "what—if any—treatment" Mr. Abubakar received for these injuries, "let alone that any treatment was immediately medically required." We agree with Mr. Wilson and therefore reverse the conviction.

The government primarily argues that a jury reasonably could have found that Mr. Abubakar suffered a significant bodily injury based on the "combined evidence" presented at trial. That evidence includes testimony about the blood "gushing" from Mr. Abubakar's face, which the government contends could lead a jury to infer that the injury would not be treatable with "everyday remedies such as ice packs [or] bandages," *Quintanilla*, 62 A.3d at 1265; testimony showing that Mr. Abubakar was in "great pain" that night; and testimony that the paramedics treated Mr. Abubakar for as long as thirty minutes in the ambulance on the scene. The government further argues that the photographs of Mr. Abubakar in a hospital bed with "lacerations on his face, dried blood, and a brace around his neck," along with the cuff on his arm and electrodes on his chest, could lead a jury fairly to infer that the brace, cuff, and electrodes were provided by a medical professional because they were "medically necessary."

However bad the injuries may seem, the government's "combined evidence" fails to show that "immediate medical attention" was required to "'prevent[] long-term physical damage and other potentially permanent injuries' or 'abat[e] pain that is severe' instead of 'lesser, short-term hurts.'"[9] *Teneyck*, 112 A.3d at 909 (quoting *Nero*, 73 A.3d at 158). For instance, the government did not elicit testimony from any paramedics or treating physicians, who could have explained whether Mr. Abubakar's injuries "required [medical treatment] to prevent 'long-term physical damage, possible disability, disfigurement, or severe pain.'" *Id.* (quoting *In re R.S.*, 6 A.3d at 859); *cf. Blair*, 114 A.3d at 979–80 (finding evidence sufficient where a doctor testified that he was "concerned" that the complainant had a "significant head injury" and hence "ordered a CAT scan and X-ray of her head and neck to determine whether she sustained internal injuries"); *Nero*, 73 A.3d at 158 (finding evidence sufficient where a doctor testified that a bullet wound such as complainant's can prove "life-threatening" and that the complainant "probably would have had a higher chance of wound infection" without treatment).

---

[9] In this regard, the question is not, as the dissent suggests, whether Mr. Abubakar was in pain, or bleeding, or treated by paramedics, or taken to the hospital, or all of the above. The question is whether the government put on evidence showing that Mr. Abubakar "require[d]" immediate medical attention aimed at one of these two ends. *Teneyck*, 112 A.3d at 909 (quoting D.C. Code § 22-404 (a)(2)). We answer that question today through a straightforward application of our felony assault cases.

Nor did the government elicit from Mr. Abubakar himself any testimony indicating the type of treatment—if any—he received. [10] Mr. Abubakar testified that he was bleeding, dizzy, and "felt like [he was] really losing [his] eye," but nowhere does he suggest that these injuries demanded treatment "of a higher order, requiring true 'medical' expertise," rather than "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications." *Quintanilla*, 62 A.3d at 1265; *cf. In re R.S.*, 6 A.3d at 857, 859 (finding evidence sufficient where the complainant testified that she received four to six stitches).[11]

The government places particular emphasis on the paramedics' involvement in the incident—as recounted by the police officers—and on the photographs of Mr. Abubakar in the hospital wearing a neck brace, cuff, and electrodes. But such evidence, without more, does not show that Mr. Abubakar's injuries required

---

[10] We have never held that the only way for the government to carry its burden of proof is to present medical or other expert testimony.

[11] When asked at oral argument how it is possible to know, beyond speculating based on the photographs, what treatment (if any) Mr. Abubakar received at the hospital, counsel for the government stated that "there is no evidence as to what the treatment was at the hospital," and that "the government admits that the record is not clear about the treatment." At another point in the exchange, counsel agreed that the record was "silent" on the question of treatment. The court then asked the government why no paramedics were called to testify or hospital records adduced. Counsel's only response—the "best on appeal that the government can make of the record"—was that the trial focused mostly on the self-defense issue.

"immediate medical attention" within the meaning of the statute. As an initial matter, "[t]he fact that an injured party immediately goes to a hospital or seeks other medical attention is not, in itself, determinative." *Quintanilla*, 62 A.3d at 1264; *see also id.* at 1263 (finding evidence insufficient even though EMTs "checked [the victim] out" onboard an ambulance and evaluated her for signs of a concussion). In some cases, a complainant may be admitted to the hospital for "diagnostic tests, pain medication, and wound care," *Nero*, 73 A.3d at 159, and yet such treatment still is not deemed "necessary . . . to prevent long-term physical damage, possible disability, disfigurement, or *severe* pain." *Id.* (quoting *Quintanilla*, 62 A.3d at 1264) (finding evidence insufficient where treating physician explained that if the complainant had not been treated, "'probably not much' would have happened, and that he 'would have had pain'"); *see also id.* (noting that "tests alone do not speak to an injury's significance"). Even assuming Mr. Abubakar did receive some form of treatment in the hospital, therefore, "the fact that medical treatment occurred does not mean that medical treatment was required." *Teneyck*, 112 A.3d at 910.

This court's recent decision in *In re D.P.*, 122 A.3d 903 (D.C. 2015), further supports our conclusion. There, a fifteen-year-old girl commuting home on a Metrobus was repeatedly punched—at least once in the face—before collapsing and hitting her head on a pole, which rendered her unconscious for "maybe a

minute, maybe less." *Id.* at 906. The EMTs arrived and escorted the girl to an ambulance, where they "checked [her] head" and blood pressure before eventually releasing her after she called her father. *Id.* at 913. In finding the evidence insufficient, the court noted that the government failed to provide medical evidence on "the nature of [the girl's] injuries." *Id.* at 907. Nor did the complainant herself testify about any medical care that she had received, stating only that she experienced headaches for a few days after the incident. *Id.* On this record, the court determined that the injuries did not qualify under the statute, holding that they were "properly categorized" with the injuries in *Quintanilla* and *Teneyck*. *Id.* at 913. The same analysis applies here.

The government also argues, as an "alternative basis for finding significant bodily injury," that even if a jury could not find that Mr. Abubakar's injuries required "immediate medical attention," the evidence supported a finding that the injuries required "hospitalization." It is true that the statute defines "significant bodily injury" as requiring either "hospitalization *or* immediate medical attention." D.C. Code § 22-404 (a)(2) (emphasis added). In *In re R.S.*, however, the court noted that "[i]t is not easy to envision a situation in which an injury might require hospitalization and yet not also require immediate medical attention." 6 A.3d at 859 n.3. The court nevertheless suggested that "[p]erhaps the hospitalization definition, which is presented as an alternative, is to cover a situation where an

injury is only latent and manifests itself a considerable time after the fact; *e.g.*, an unrecognized internal injury or concussion." *Id.* Then in *Quintanilla*, the court left open the possibility that an injury could require hospitalization in "fluid situations" that involve "immediate then prolonged monitoring, coupled with testing," regardless of whether such monitoring or testing "eventuate[s] in treatment." 62 A.3d at 1264 n.18; *see also Blair*, 114 A.3d at 979. Finally, the court in *Teneyck* clarified that "'hospitalization' under the statute requires more than being admitted for outpatient care." 112 A.3d at 909 n.4; *see also In re D.P.*, 122 A.3d at 911 n.18.

The evidence presented here falls short of the threshold set by these cases. The record contains no indication that Mr. Abubakar had a "latent" injury that "manifest[ed] itself a considerable time after the fact," that he received any prolonged monitoring or testing, or that he was admitted for inpatient treatment at the hospital. It reveals almost nothing about the circumstances surrounding Mr. Abubakar's admission to the hospital.

Because the government failed to introduce sufficient evidence of significant bodily injury, we reverse the felony assault conviction and remand for the trial court to enter a judgment of conviction for simple assault. *See Quintanilla*, 62 A.3d at 1262, 1266.

*So ordered.*

BELSON, *Senior Judge*, dissenting.

I do not agree that the evidence, viewed in the light most favorable to the government, was insufficient to convict appellant of felony assault. The physical attack by taxi passenger Daric Wilson on taxi driver Salim Abubakar was violent and obviously so severe that it could inflict significant injury, as defined in D.C. Code § 22-404 (a)(2) (2012 Repl.) ("[T]he term 'significant bodily injury' means an injury that requires hospitalization or immediate medical attention."). Incensed by what he considered the driver's failure to take him and his fellow passengers to the desired location, Mr. Wilson viciously attacked Mr. Abubakar. In the course of that attack, Mr. Wilson choked Mr. Abubakar and then struck him above his left eye, causing very severe bleeding. The blow made Mr. Abubakar dizzy. Mr. Wilson, who is much larger than his victim, then leapt upon Mr. Abubakar's back, wrapped his own legs around Mr. Abubakar's legs, and drove him face forward to the ground. Mr. Abubakar hit the ground so hard, according to Mr. Wilson's fellow passenger, that it caused a "dull thud" that "sounded like it hurt."

A woman was watching from her apartment window as the encounter unfolded. She saw the driver get out of his cab and turn in the direction of Mr.

Wilson and his companions. While it did not appear to her that the driver was acting aggressively, Mr. Wilson was very aggressive and was acting like a "schoolyard bully." She said that the much smaller victim appeared intimidated, especially when Mr. Wilson yanked on the sleeve of his victim's jacket and attempted to pull the jacket over his head. At that point, she decided to intervene and, as she went outside, instructed her husband to call the police. On her way out, she heard "a very guttural terrified scream" as if someone was "absolutely getting pummeled." Mr. Wilson accompanied his onslaught against Mr. Abubakar with racist comments that Mr. Abubakar found "hurtful."

The police officers who responded to the scene testified to Mr. Abubakar's profuse bleeding caused by Mr. Wilson's attack. One officer also testified that at that time Mr. Abubakar could not really talk that well, that at one point his jaw would not move, and that the medical first responders thought his jaw might be broken. After putting Mr. Abubakar in the ambulance and tending to him for about a half-hour, the paramedics took him to the hospital in the ambulance.

There is no explanation in the record for the absence of testimony of hospital personnel and of hospital records.[1] There are, however, photographs of Mr.

---

[1] This court has not held that the need for immediate medical attention can be proven only by medical or other expert witnesses.

Abubakar taken at the hospital, which were admitted without objection, one of which shows him with the neck brace that was fitted on him and a blood pressure sleeve, as well as what are apparently electrocardiogram leads attached to his chest. It shows the injury above Mr. Abubakar's eye and the scratches, inferentially suffered when Mr. Wilson drove his face into the ground.

The majority opinion states that "However bad the injuries may seem, the government's 'combined evidence' fails to show that 'immediate medical attention' was required to 'prevent[] long-term physical damage and other potentially permanent injuries' or 'abat[e] pain that is severe' instead of 'lesser, short-term hurts.'" *Ante* at 12-13 (quoting *Teneyck v. United States*, 112 A.3d 906, 909 (D.C. 2015) (quoting *Nero v. United States*, 73 A.3d 153, 158 (D.C. 2013))).

The majority's view of the injuries that Mr. Wilson inflicted on Mr. Abubakar is contradicted by the conduct of the police officers and later the paramedics on the scene, as well as by the testimony of Mr. Abubakar himself. An ambulance was summoned. The accompanying paramedics tended to Mr. Abubakar for as long as half an hour at the scene, and decided to take him to the hospital for treatment. Clearly this was not a case of minor injuries which trained medical personnel thought could be treated by "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications . . . ."

*Quintanilla v. United States*, 62 A.3d 1261, 1265 (D.C. 2013).

Even without testimony of hospital personnel or the submission of hospital records, there was ample evidence before the jury to support its finding of significant injury. In particular, the photograph of Mr. Abubakar taken at the hospital showing him in a neck brace, obviously placed on him by medically-trained personnel, gives strong support to the verdict. Mr. Abubakar testified that the beating caused him "great pain." The jury could infer on this record that immediate medical attention was needed to abate that pain. The decision of the paramedics to transport Mr. Abubakar to the hospital after tending to him for about one half hour at the scene of his beating, and the attention he received at the hospital as evinced by the photographs in evidence stand in sharp contrast with the evidence in a case like *Quintanilla*, *supra*, 62 A.3d at 1265, where even the victim of the assault thought she was capable of taking care of herself and declined transportation to a hospital by the paramedics who arrived at the scene of her assault with an ambulance.

The trial judge properly instructed the jury that:

> [S]ignificant bodily injury means an injury that requires
> hospitalization or immediate medical attention in order to
> preserve the health and well-being of the individual . . . .
> [Y]ou must consider the nature of the alleged injury itself
> and the practical need in the ordinary course of events for
> hospitalization or prompt medical attention in

determining whether significant bodily injury occurred here.

The jury heard the evidence and was convinced beyond a reasonable doubt that it demonstrated that Mr. Abubakar had suffered a significant injury based on his need for immediate medical attention and treatment. More specifically, the verdict is supported by evidence about the beating, the bleeding, the pain, the dizziness, as well as Mr. Abubakar's inability to move his jaw, which a medical technician thought was broken, the subsequent decision by trained medical personnel to seek further medical treatment at the hospital after tending to Mr. Abubakar for a half-hour at the scene, and the medical decision to fit Mr. Abubakar with a neck brace. Under the circumstances that they encountered, it would have been irresponsible for emergency medical technicians not to see to it that Mr. Abubakar was taken to the hospital for immediate medical attention in order to abate his severe pain or to prevent long-term physical damage or other potentially permanent injuries. *Teneyck*, *supra*, 112 A.3d at 909; *Nero*, *supra*, 73 A.3d at 158.

The attached photo of the beaten Mr. Abubakar at the hospital serves to describe his physical injuries better than the proverbial "thousand words." The jury learned that the beating had a profound effect on the life of Mr. Abubakar, who testified that he is no longer driving a taxicab "because of this man[,]"

referring to Mr. Wilson.

This court's opinions have offered various formulations or examples in recent years in an effort to differentiate between the types of assault that constitute aggravated assault (serious injury), felony assault (significant injury), and simple assault (lesser injuries, neither serious nor substantial.)  Many such cases are quoted in the majority opinion.  The examples and formulations they offer frequently arise out of the facts of a particular case before the court.  These opinions must, of course, be considered when this court is called upon to evaluate the facts of each appeal as it comes before us, but they should not be applied in a way that trenches upon the authority of a jury to consider the facts of a case and apply the statute as embodied in the jury instructions.  As the Supreme Court noted in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the relevant inquiry is not whether the evidence convinces an appellate court of the defendant's guilt beyond a reasonable doubt, but whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (emphasis in original).

The facts before the jury in this case, including the nature of the injuries inflicted on Mr. Abubakar and the obvious "practical need in the ordinary course

of events for hospitalization or prompt medical attention" (in the words of the instructions the jury was applying), led the jury to find that appellant inflicted a significant injury on Mr. Abubakar. *See id.* The same reality that led the police officers to assist in bringing Mr. Abubakar into the care of the paramedics and led them, in turn, to treat and then transport him to the hospital gives a firm evidentiary foundation to the jury's verdict. This court should not overturn the jury's verdict that found that Mr. Abubakar suffered "injury that requires hospitalization or immediate medical attention," and, thus, that Mr. Wilson committed a felony assault under D.C. Code § 22-404 (a)(2).[2]

---

[2] Another appeal involving the sufficiency of the evidence to establish felony assault is pending before a division of this court. *Belt v. United States*, No. 15-CF-324.

**Appendix**

