# District of Columbia
# Court of Appeals

**No. 15-CF-737**

STEPHON BROWN,



Appellant,

v.

**CF3-21539-14**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: THOMPSON and BECKWITH, *Associate Judges*; and KING, *Senior Judge*.

## J U D G M E N T

This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of conviction is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: September 1, 2016.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-737

STEPHON BROWN, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 9/1/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF3-21539-14)

(Hon. Todd E. Edelman, Trial Judge)

(Submitted June 8, 2016                    Decided September 1, 2016)

*Sicilia C. Englert* was on the brief for appellant.

*Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Christine M. Macey*, and *Kristina L. Ament*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and KING, *Senior Judge*.

THOMPSON, *Associate Judge*:   On December 15, 2014, while attempting to make a restaurant food delivery, Gregory Dowell was attacked by two men who repeatedly punched and kicked him in the head and elsewhere before taking his iPhone, wallet, and vest.  One of the men also rode away on Dowell's bicycle.

Dowell reported the incident to the police, who ran a check to identify any individuals whose GPS monitoring devices showed them to have been in the area at the time of the incident. Through that check, the police learned that appellant, Stephon Brown, had been in the area around that time. They went to appellant's house, found Dowell's bicycle in the backyard, and arrested appellant. Five days after the beating, Dowell, who had been experiencing headaches since the attack, went to the hospital and was diagnosed with a concussion.

On April 21, 2015, after a trial before the Honorable Todd E. Edelman, a jury convicted appellant of robbery and assault with significant bodily injury. Appellant now argues that the evidence was insufficient to establish he was the perpetrator of the robbery and assault. He also argues that the victim's injury was not "significant" because Dowell "was not hospitalized and received no medical treatment[.]" We affirm.

**I.**

This court's review of sufficiency-of-the-evidence claims is *de novo*. *See Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013). We "view the evidence in the light most favorable to the government, mindful of the jury's right to determine

credibility, weigh the evidence, and draw justifiable inferences of fact." *Blair v. United States*, 114 A.3d 960, 976 (D.C. 2015) (quoting *Robinson v. United States*, 506 A.2d 572, 573 (D.C. 1986)). To prevail on a claim that the evidence was insufficient for conviction, an appellant "must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Carter v. United States*, 957 A.2d 9, 14 (D.C. 2008) (internal quotation marks omitted). "This is a heavy burden." *Blair*, 114 A.3d at 976 (internal quotation marks omitted). "[T]he government's evidence need not negate every possible inference of innocence to be sufficient." *Smith v. United States*, 899 A.2d 119, 121, 123-24 (D.C. 2006) (internal quotation marks omitted). "The issue is whether the evidence is probative enough to permit the jury to make [the] required inference beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 149-50 n.33 (D.C. 2001) (Ruiz, J., concurring).

## II.

Appellant's first argument is that the government failed to prove that he was the individual who committed the robbery and assault against Dowell. Appellant does not dispute that, close to the time of the robbery, he was on the block where the robbery occurred; he also does not dispute that the stolen bicycle was found in

his backyard a few hours later. Rather, he argues that the government "failed to offer sufficient evidence to disprove" his theory of the case — that he found an abandoned bicycle and rode it home.

We are satisfied that the evidence presented at trial was sufficient to enable the jury to find beyond a reasonable doubt that appellant was one of the men who robbed and assaulted Dowell. Dowell testified that he arrived at the delivery location (on North Capitol Street, N.E., between T Street and Seaton Place) at "around 8:50 p.m." on the night in question, and that two men passed him, going in a northbound direction. Shortly thereafter, Dowell was attacked by two men, one of whom he recognized as one of the men who had just passed him. When fleeing after the attack, that man moved north on North Capitol Street before taking the first right. The government also presented GPS data showing appellant's locations that evening. The GPS data indicated that, between 8:50 p.m. and 8:51 p.m., appellant moved north from North Capitol Street, N.W., between S Street and Randolph Place, to North Capitol Street, N.E., near T Street, on the block between T Street and Seaton Place. At 8:51 p.m., appellant was near the intersection of North Capitol and T Streets, N.E. The data further indicated that, by 8:52 p.m., appellant had moved south to North Capitol Street and Seaton Place, N.E., and that, by 8:53 p.m., he had moved northward again, to the intersection of North

Capitol Street and T Streets, N.E. The data indicated that appellant thereafter remained in the same location for "several track points" and then, after 9:04 p.m., moved east on T Street, N.E.

Viewing the evidence in the light most favorable to the government, we disagree with appellant's assertion that the tracking data was "inconsistent" with Dowell's testimony. Instead, a reasonable juror could have found that the GPS tracking data about appellant's movements between 8:50 p.m. and 8:53 p.m. on the evening in question were sufficiently consistent with Dowell's description of the movement of one of his attackers to prove beyond a reasonable doubt, in conjunction with the other evidence, that appellant was one of the individuals who walked past Dowell and then returned and robbed and assaulted him, and further that appellant was the assailant who fled north before turning east at "the first right." Dowell's testimony that, during the assault, he did not see or hear anyone on the block other than his assailants and that no one responded to his calls for help was further evidence that appellant, who the GPS data showed was in the area "around 8:50 p.m.[,]" was one of the men who participated in the robbery and assault. Moreover, from the evidence that the customized bicycle was found only a few hours later in appellant's backyard, the jury could reject, as "unsatisfactory," appellant's explanation that he found an abandoned bicycle and rode it home, and

could infer instead, without mere speculation, that he stole the bicycle. *See White v. United States*, 300 A.2d 716, 718 (D.C. 1973) ("[T]he unexplained or unsatisfactorily explained possession of property recently stolen permits an inference that the possessor is the person who stole it."). Notably, unlike the defendant in *White*, whose conviction for larceny was affirmed even though he "undertook to explain his possession of the [stolen] articles[,]" *id.* at 718 n.7, appellant offered no testimony or other evidence to support his explanation; the theory that appellant merely "walk[ed] right through a crime scene that just happened" and "f[ound] a bicycle abandoned and r[ode] home" was advanced only during the defense's closing argument.

Appellant argues that the tracking data do not match Dowell's testimony about the direction his attackers walked. Specifically, he invokes the tracking data showing that, at 8:52 p.m., "the device was near Seaton Place, which is farther south than the townhouse" where the robbery occurred. He emphasizes that Dowell did not testify that the (eventual) assailants "walked south *past* the townhouse" before attacking him. Appellant is correct that Dowell (who was attempting to make his delivery, dealing with a locked gate, and trying to reach the customer by cell phone) did not testify to that chronology; but the testimony he gave did not eliminate the possibility that the attackers did precisely that while

Dowell was distracted. Moreover, testimony established that the GPS monitoring data generally are accurate within a fifty-foot radius of each point plotted on a map, allowing the jury to conclude that appellant was in fact closer to the location of the assault at 8:52 p.m. than the plotted point indicates (e.g., not as far south as indicated). Thus, the purported discrepancy appellant highlights does not undermine the reasonableness of the inference supported by the GPS data and the discovery of Dowell's bicycle in appellant's backyard.[1]

Accordingly, we reject appellant's argument that there was insufficient evidence that he was the individual who robbed and beat Dowell.

**III.**

Appellant also argues that the government failed to present evidence sufficient to prove that Dowell's injuries amounted to "significant bodily injury" within the meaning of the felony assault statute, D.C. Code § 22-404 (a)(2) (2012

---

[1] Appellant also challenges the sufficiency of the evidence linking Dowell's testimony and the GPS data because the government did not establish the precise time of the robbery. However, the jury was entitled to treat the GPS data placing appellant near the area of the robbery between 8:47 p.m. and 8:55 p.m. as consistent with Dowell's testimony that he arrived to make his delivery at "around" 8:50 p.m.

Repl.).  The statute defines "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention."  § 22-404 (a)(2).

At trial, the government presented evidence that Dowell sustained "a lot of rapid blows" to the head from both assailants and punches that knocked him to the ground twice.  He testified that he was also kicked in the head and shin when he was on the ground.[2]  The jury saw photographs showing a laceration on his forehead; bright red areas on his forehead, on multiple areas of his scalp (on the top, back and sides of his head), and on multiple places on his neck and ears; and what appear to be lacerations on his ears. Dowell testified that after the attack, he felt "loopy" and "dazed" and that his head hurt and was swollen; the head pain persisted for several days after the attack.  Ambulance medics who attended to Dowell on the day of the attack urged him to go to the hospital, as did a friend who is a nurse days later, but he resisted because he had no health insurance; the nurse finally "made [him] go" to a hospital and said she would pay for his medical expenses.

---

[2]  Dowell testified that one of the blows "knocked [him] out for a second[.]" The emergency room physician who evaluated Dowell days after the assault testified, however, that, according to triage records, Dowell "denied that he blacked out or passed out" during the incident.

When Dowell presented at the hospital five days after the assault, he complained of a constant headache (that was at an "unacceptable" pain level), decreased appetite, and dizziness. Based on those symptoms, Dr. Karen Pheasant, the doctor who attended to him at the hospital, diagnosed him with a concussion. Dr. Pheasant testified that a concussion "results in an alteration of how the brain functions[,]" that it is "important for people with concussions to seek medical treatment[,]" and that doctors "want anyone who has a head injury to come in and be evaluated so we can help determine what they do or don't need" or if they "need close follow-up[.]"[3] Dr. Pheasant further testified that, because Dowell had a head injury, she ordered a CAT scan, the "typical[]" "test of choice" for anyone complaining of a head injury, especially one that may include trauma. Based on the results of the CAT scan, she was able to rule out "other, more significant

---

[3]    Consistent with Dr. Pheasant's testimony, Dowell was given patient-education materials at the hospital (part of Government Ex. 5) that state that "[p]eople with a concussion need to be examined or evaluated," in part because "problems may be missed by patients, family members and caregivers." Under the heading "Treatment," the materials state that "[m]ost people with concussions are treated in an emergency department, urgent care or clinic. Some people must stay in the hospital for further treatment. Your caregiver will send you home with important instructions to follow. Be sure to carefully follow them."

causes still contributing to his persistent headache" such as a skull fracture.[4]  She testified that "the first treatment" of a concussion is to discuss with the patient how he should adjust his lifestyle, alter his daily activities, avoid straining his eyes, stay hydrated to allow his body to rest and heal, and monitor his symptoms.  The doctor testified that a concussion patient's failure to adjust his activities may make the symptoms worse or make them "last longer[,]" and that if a concussion victim "put[s] [himself] in a position where [he] sustain[s] a second concussion after the first concussion has completely resolved, it can . . . make the symptoms much worse[.]"[5]  Dr. Pheasant testified that in addition to discussing these matters with Dowell and instructing him on what symptoms to watch for, she made a follow-up appointment for Dowell in case his symptoms did not improve and "further treatment" was needed.  She acknowledged that some people who do not follow the recommended course "may do okay on their own."

Our case law establishes that "significant bodily injury" occurs where:

---

[4]  According to testimony recounted in published cases, a CAT scan may also reveal head injuries such as bleeding on the brain, which can result in visual impairment, *see In re Te.L.*, 844 A.2d 333, 336 (D.C. 2004); swelling in the brain, *see Johnson v. State*, 628 S.E.2d 183, 185 (Ga. Ct. App. 2006); and trauma-related organic brain syndrome, *see Commonwealth v. Oree*, 911 A.2d 169, 171 (Pa. Super. Ct. 2006).

[5]  Dr. Pheasant testified that Dowell's medical history indicated he had sustained "two prior concussions."

> there is an injury to the body that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is required where it is necessary to preserve the health and well being of the individual, *e.g.*, to prevent long-term physical damage, possible disability, disfigurement, or severe pain.

*In re R.S.*, 6 A.3d 854, 859 (D.C. 2010) (ellipses omitted). "The inquiry[] . . . is not whether the injuries were, or were not, cared for, but, rather, whether a reasonable juror could find that the injuries were of a 'nature' that objectively — 'in the ordinary course of events' — would[] . . . 'require hospitalization or immediate medical attention.'" *Quintanilla v. United States*, 62 A.3d 1261, 1264 (D.C. 2013) (quoting *R.S.*, 6 A.3d at 859) (brackets omitted); D.C. Code § 22-404 (a)(2). We have said that while "not every blow to the head in the course of an assault necessarily constitutes significant bodily injury," "where . . . the defendant repeatedly struck the victim's head, requiring testing or monitoring to diagnose possible internal head injuries, and also caused injuries all over the victim's body, the assault is sufficiently egregious to constitute significant bodily injury." *Blair*, 114 A.3d at 980.

Although the issue is perhaps a closer one than we have seen in some previous cases, in light of the testimony described above, we conclude that the

evidence was sufficient to show that Dowell sustained "significant bodily injury." Dowell sustained repeated blows to his head and leg; as in *Blair*, Dowell's assailants "repeatedly struck the victim's head, requiring testing or monitoring to diagnose possible internal head injuries," circumstances that we concluded supported a finding of significant bodily injury. *See* 114 A.3d at 980.

Further, Dowell suffered lingering head pain as a result of the assault. Although he did not go to the hospital right away, all of the medical professionals he encountered urged him to do so, or, in the case of Dr. Pheasant, explained why it was important that he did so. At the hospital, Dowell did not receive "mere diagnosis," *Quintanilla*, 62 A.3d at 1264-65, but was instructed by Dr. Pheasant about what he needed to do to avert worsened or prolonged head pain or other symptoms. Thus, Dowell's injury was one that, to preserve his well-being, "necessitate[d] [that he be] taken to the hospital . . . shortly after the injury was inflicted." *R.S.*, 6 A.3d at 859. Although there was no evidence that he received treatment in the way of surgical intervention or medication, he received what Dr. Pheasant identified as the "treatment" that a concussion calls for: a CAT scan to identify or rule out additional head injuries, as well as prescribed limitations on his physical activity necessary to avoid worsened and prolonged symptoms. The possibility that Dowell (who had had previous concussions) might have known to

avoid strenuous activity and eye strain and to stay hydrated even without his emergency room visit, and thus might have "do[ne] okay" on his own, does not undermine the seriousness of his injury or negate the testimony that his head injury, a concussion, was one that required "immediate medical attention[,]" D.C. Code § 22-404 (a)(2), by a professional with "true 'medical' expertise[.]" *Quintanilla*, 62 A.3d at 1265.

For all the foregoing reasons, we are satisfied that the evidence was sufficient to support appellant's conviction of assault with significant bodily injury.

Wherefore, the judgment of conviction is

*Affirmed.*