# District of Columbia
# Court of Appeals

**No. 14-CF-1147**

ALEXANDER HUGHES,

Appellant,

v.

UNITED STATES,

Appellee.



CF1-6536-13

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:   GLICKMAN and MCLEESE, *Associate Judges*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.   On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's judgment relating to appellant's convictions on the Lopez charges is affirmed; however, the trial court's judgment with respect to appellant's convictions on Sanchez count 16, and his convictions on Mohamud counts 19, 20, and 21, is reversed, and those counts are remanded to the trial court for new trial.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: December 15, 2016.

Opinion by Senior Judge Inez Smith Reid.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-1147

ALEXANDER HUGHES, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED **12/15/16**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF1-6536-13)

(Hon. John Ramsey Johnson, Trial Judge)

(Argued February 3, 2016                     Decided December 15, 2016)

*Jason Kalafat* for appellant.

*Timothy R. Cahill*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Amy H. Zubrensky*, and *Rebekah Holman*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*:   After trial on a twenty-six count indictment relating to sexual abuse and other charges,[1] a jury found Alexander Hughes guilty of fourteen

---

[1]   The indictment charged Mr. Hughes with two counts of kidnapping, five counts of first-degree sexual abuse, five counts of second-degree sexual abuse, eight

(continued…)

of the charged counts.[2]  On appeal, he contends that (1) the trial court abused its discretion by denying his pre-trial motion to sever the counts involving one complainant from the counts concerning the other two complainants, thereby resulting in substantial prejudice to him; and (2) the government's evidence was insufficient to convict him of the charges beyond a reasonable doubt.  For the reasons stated below, we affirm the trial court's judgment relating to Mr. Hughes's convictions on the Lopez charges.   However, we reverse the trial court's judgment with respect to Mr. Hughes's convictions on misdemeanor sexual abuse counts 16, 19, 20, and destruction of property count 21, and remand those counts to the trial court for a new trial.

---

 (…continued)
counts of misdemeanor sexual abuse, one count of attempted misdemeanor sexual abuse, one count of assault, one count of destroying property, one count of attempted lewd, indecent, or obscene acts, one count of third-degree sexual abuse, and one count of assault with significant body injury.

[2]  Guilty verdicts were handed down on:  one count of kidnapping, D.C. Code § 22-2001 (2012 Repl.); one count of first-degree sexual abuse (force with aggravating circumstances), D.C. Code § 22-3002 (a)(1); three counts of second-degree sexual abuse (threats with aggravating circumstances), D.C. Code § 22-3003 (1); seven counts of misdemeanor sexual abuse (with aggravating circumstances), D.C. Code §§ 22-3006, -3020 (a)(5); one count of destruction of property (less than $1000), D.C. Code § 22-303; and one count of simple assault, D.C. Code § 22-404 (a)(5).

## FACTUAL SUMMARY

To prove its charges of sexual abuse in the workplace, the government presented evidence showing that Mr. Hughes worked as a supervisor for FAME Food Management and was assigned to the cafeteria at the Nebraska Avenue Complex ("NAC") of the federal Department of Homeland Security, Federal Protective Service ("FPS"). All of the complainants worked at the NAC and were supervised by Mr. Hughes. The government's evidence was designed to show that over the course of one year, December 1, 2011, through December 3, 2012, Mr. Hughes committed twenty criminal acts against Suyapa Sorto de Lopez (kidnapping; first-, second-, and third- degree sexual abuse; misdemeanor sexual abuse; and assault); three against Rosa Sanchez (misdemeanor and attempted misdemeanor sexual abuse, and assault); and three against Nasro Mohamud (misdemeanor sexual abuse, and destruction of property).

The first of the complainants to testify was Ms. Mohamud.[3] She described incidents involving Mr. Hughes and Ms. Lopez and Ms. Sanchez, as well as one involving herself. On one occasion Mr. Hughes licked one of his fingers and put it

---

[3] Mr. Hughes was her supervisor for about three years. She described him as "a tough supervisor" whom she feared. Mr. Hughes would threaten employees with termination if they did not perform their duties.

in Ms. Sanchez's ear; Mr. Hughes's fingernail "punctured the ear" and "a little bit of blood came out." In 2012, Mr. Hughes hit both Ms. Sanchez and Ms. Lopez on the buttocks with a wet, rolled-up towel. Mr. Hughes also hit Ms. Lopez on the buttocks with a cooking utensil, a spatula. Ms. Lopez would complain about Mr. Hughes hiding her shoes or her keys so that she could not leave at the end of her shift. One morning Mr. Hughes kicked Ms. Lopez in her back while she was cutting fruit, and later that same morning he hit her on the buttocks with a clipboard. On another occasion, Mr. Hughes grabbed Ms. Lopez by the neck as she was passing by him. Ms. Lopez tried to wiggle free, then turned around, slid Mr. Hughes's pants down and pushed him; Mr. Hughes pulled his pants up, and Ms. Lopez fell to her knees. Mr. Hughes said he was sorry.

One of the incidents involving Ms. Mohamud and Mr. Hughes occurred in summer 2012 while Ms. Mohamud was cutting fruit and Mr. Hughes was cleaning the doughnut station with bleach. Her back was to Mr. Hughes. He sprayed her with the bleach from the top of her pants to her legs, including her buttocks. In doing so, Mr. Hughes damaged her pants to such an extent that she had to borrow another pair from a co-worker. Mr. Hughes apologized and offered her money to replace the pants. Ms. Mohamud could not recall the date on which Mr. Hughes hit her in the "[s]ame way as he hit [Ms. Sanchez]," that is on her buttocks with the wet,

rolled-up towel. She "felt a little pain." Ms. Mohamud was afraid of being fired; nevertheless she told Mr. Hughes not to hit her again.

The government's second witness, Ms. Sanchez, worked for FAME at the NAC until sometime in 2012, when she left because she felt "pressured" by Mr. Hughes, and because he did not treat employees well. Once Mr. Hughes touched his private part and commented on its size. At other times, he "would pull down his pants" and show "his bottom." While she was making sandwiches one day, Mr. Hughes tried to touch her breast but she folded her arms. She had previously seen Mr. Hughes try to touch Ms. Lopez's breast. Mr. Hughes hit Ms. Sanchez on the buttocks with a rolled-up, wet towel more than twice; he also hit other women with the towel. He hit Ms. Lopez on the buttocks with a towel and a spatula "several times" in 2012 as both women were cutting fruit. One day Mr. Hughes wet his finger and then used it to scratch the interior of Ms. Sanchez's ear, causing it to bleed a little bit. Ms. Sanchez and Ms. Lopez informed Mr. Hughes that they wished to speak with the owners of the business, but Mr. Hughes said he would never let them talk to the owners.

When Mr. Hughes asked Ms. Lopez for headache medicine or gum, she would go to the room where the women changed their clothes and kept their purses.

Mr. Hughes would insist that Ms. Lopez get the items for him, and he would follow her into the changing room. They would be in the room for approximately ten minutes. Once when Ms. Lopez returned from the area, she looked pale, she was fixing her hair, and her eyes were red. Ms. Lopez said that Mr. Hughes "forced her to do oral sex." Another time when Ms. Sanchez was going to the refrigerator, she saw Mr. Hughes in the hallway with his hands on Ms. Lopez's hands, forcing and pushing her against the wall. Ms. Lopez, who was angry and pale, was pushing to get away. When Mr. Hughes saw Ms. Sanchez, he released Ms. Lopez. Mr. Hughes hid Ms. Lopez's shoes once "so that she wouldn't leave" at the end of her shift.

Ms. Lopez was the third complainant to testify. She worked at the NAC for four years, two years under Mr. Hughes's supervision.[4] Mr. Hughes began to touch her buttocks with his hand, a towel, a spatula, or his private part. He would grab a wet towel and hit her on her buttocks or her legs "many times." He would hit her so hard with the spatula or the towel that she would "run and get ice," and the impacted area "would get red and swollen." Mr. Hughes would "laugh and leave."

---

[4] After about one year of his supervision, Mr. Hughes "started to be disrespectful and say that [the employees] were bad, . . . dumb, . . . stupid, that he was the smart one." Mr. Hughes "would scream" and called Ms. Lopez "stupid to [her] face."

Sometimes Ms. Lopez would scream and sometimes she would laugh after these incidents. She would scream because the blow hurt and she would laugh because she did not know "what to do." In 2012, Ms. Lopez saw Mr. Hughes hit both Ms. Sanchez and Ms. Mohamud with a rolled-up towel. She never saw him hit the two male employees.

Ms. Lopez described instances of sexual abuse by Mr. Hughes. Sometime in 2012, around 10:40 a.m., while other employees were on break but she was still working, she was walking to the refrigerator when Mr. Hughes grabbed her by her hair and pushed her toward the room the women used to change their clothes. After forcing her into the room he tried to pull her pants down, and she tried to pull them back up. He pulled her pants down again, hit her with his hand, asked if she wanted to lose her job, forced his private part into her anus, and ejaculated in her anus. Her hair "had come all undone," and she was crying, but managed to "put [herself] together and [to go] back to work." About one or two weeks later, Mr. Hughes again accosted Ms. Lopez. She had gone to the back of the cafeteria to get a container. He again grabbed her hair and pushed her into the changing room and penetrated her.

On other occasions, Mr. Hughes forced Ms. Lopez to perform oral sex – in the changing room, a closet where dry food was kept, the men's room, and her car. One morning she was on her way to the changing room to get her migraine medication, and as she was bending down in the room to get her purse from on top of a box, Mr. Hughes grabbed her by her hair, "h[e]ld [her] hard," put his private part in her mouth, and ejaculated into her mouth. She spit into a glove she was wearing and threw it into the trash. Mr. Hughes tied up the trash bag and put it in a hole in the changing room. Oral sex took place on more than one occasion, after which Ms. Lopez would spit the result out into the trash and Mr. Hughes would put the trash in the changing room hole or put it outside in the trash. Earlier, Ms. Lopez testified before the grand jury that Mr. Hughes would threaten to fire her if she did not do what he wanted. Sometimes he would hide her purse and keys so she could not leave. As she put it, "many times he hid my personal things so that at the last minute he could do what he wanted to do." Oral sex happened in the dry goods area "more than once." As for the bathroom, early one morning around 5:45 or 6:00 a.m., Ms. Lopez was cutting up fruit when Mr. Hughes told her to "meet [him] in the bathroom." When she did not meet him there, he returned and told her he was waiting for her. When she declined to follow him, he said, "do you want me to kick you out? Do you want to lose your job?" She went to the bathroom and Mr. Hughes put his private part in her mouth. She told Ms. Sanchez about the oral sex but was

too embarrassed to mention the anal penetration. She did not tell her husband because "he's a very angry and abusive man." He would have made her leave her job, but she needed to work because "[h]e did not have a stable job." She also "was afraid he would kill [her]."

Special Agent Marco Monteiro, a criminal investigator with the FPS, was assigned to the team investigating Ms. Lopez's complaint against Mr. Hughes. When he went to the coat room (the changing room) at the NAC cafeteria and looked into the crawl space in the ceiling, he discovered and collected as evidence plastic bags containing different items. He placed these plastic bags in other bags, sealed them and took them to the laboratory at the Metropolitan Police Department ("MPD"). Officer Nathaniel Covington, a crime scene investigator for the MPD, went through the bags and pulled out latex gloves; he and his team examined the gloves using the alternate light source technique to determine which gloves contained body fluids. They packaged and sealed these gloves. Jessica Skillman, a forensic scientist at the Department of Forensic Sciences and an expert in serology, examined the gloves for the presence of semen. Three of the gloves tested positive for semen. She took samples of the three gloves for DNA testing. Ms. Skillman also received reference samples in the form of buccal swabs from Ms. Lopez and Mr. Hughes. She prepared a cutting of these samples for DNA testing. A forensic

serologist and DNA analyst at the Department of Forensic Sciences, Christiana Shoopman, developed a DNA profile from cuttings made by Ms. Skillman. Further testing revealed that the semen from the three gloves tested by Ms. Skillman matched the DNA profile obtained from the swab that came from Mr. Hughes.

On the morning of December 3, 2012, Ms. Lopez was cutting up vegetables in the back of the cafeteria when Mr. Hughes arrived at work. He was making body movements and his private part was "erect." He said he was "horny." He went into his office, came out later with a clipboard and hit Ms. Lopez's buttocks. She screamed and said she would "kick his butt" if he did it again. He laughed, returned to his office, but emerged within five minutes, hit her either with his hand or the clipboard, and laughed. Ms. Lopez was angry, entered Mr. Hughes's office, and "grabbed his shirt." In turn, he grabbed her, pulled her toward the closet, held her with one arm and touched her breasts with the other arm. She tried to free herself and hit him. Eventually she broke loose, but he kicked her on the buttocks, and she "fell down on one knee," her right knee. She felt pain and began to cry. He laughed and twice said she was "going to die." He did not apologize or help her up. She sought assistance from Ms. Mohamud who brought her ice for the knee. At the end of the day, Ms. Lopez went to the infirmary at the NAC; she was treated later at

the hospital, and by an orthopedic surgeon.  She missed time from work due to more than one surgery on her knee and physical therapy.[5]

At the end of the presentation of the government's evidence, defense counsel moved to dismiss certain counts relating to Ms. Lopez on the ground of insufficient evidence.  The government acknowledged evidentiary problems with respect to certain counts identified by defense counsel, and hence, the government moved to dismiss certain counts involving kidnapping, first-degree sexual abuse and an attempted lewd, indecent or obscene act by Mr. Hughes.[6]

---

[5]  Dr. Christopher Magee, the orthopedic surgeon who treated Ms. Lopez, testified as a fact witness.  Before he saw Ms. Lopez on December 12, 2012, she had been treated on December 5, 2012, at Washington Adventist Hospital.  Ms. Lopez complained about pain in her right knee, and she told Dr. Magee that she had been injured on December 3, 2012, when she was accosted by her supervisor.  She reported that her supervisor "pushed her and that she landed directly on her knees." After an MRI scan, Dr. Magee diagnosed a torn meniscus or cartilage in her knee. He performed surgery on April 9, 2013, which revealed damage to the thigh bone near the knee and floating cartilage.  Complications developed following surgery and Ms. Lopez was not able to return to work.  One of Dr. Magee's partners later performed a procedure to transplant "healthy surface cartilage from one area of the knee into the damaged surface of the knee."

[6]  The dismissed counts were counts 4 (kidnapping), 5 (first-degree sexual abuse – oral sex in changing room), 7 (first-degree sexual abuse – oral sex in pantry), 9 (first-degree sexual abuse – oral sex in a restroom), 11 (first-degree sexual abuse – oral sex in a parking lot), and 22 (attempted lewd, indecent or obscene act – exposure by Mr. Hughes of genitalia in public).

Mr. Hughes presented several witnesses who testified that Ms. Lopez did not report oral sex or penetration by Mr. Hughes, and stated that she injured herself when she twisted her ankle. Others indicated that Mr. Hughes and Ms. Lopez "hors[ed] around" or teased each other by hitting each other's buttocks. Other witnesses talked about staff positions and administrative issues facing FAME, Mr. Hughes's schedule of work, or experiences with him at work that were inconsistent with Ms. Lopez's description of him.[7] The jury found Mr. Hughes not guilty of counts 8, 12, 24-26 (involving Ms. Lopez), and counts 17 and 18 (relating to Ms. Sanchez).[8] However, the jury convicted Mr. Hughes of the remaining counts –

---

[7] During her testimony, Ms. Lopez acknowledged that she told the nurse at the infirmary on December 3, 2012, that she had rolled her ankle, and that she informed an FPS investigator that Mr. Hughes never touched anything on her person, except her buttocks. When she sought a "Peace Order" against Mr. Hughes in Maryland, and Mr. Hughes's attorney questioned her, she said that she had never engaged in any sexual acts with Mr. Hughes. Ms. Lopez explained that her husband was present at the time. However, she declared that after she became depressed, her brother died, and the doctor increased the dosage of her medication, she reported the sexual abuse to law-enforcement authorities.

Based on the testimony of his witnesses, Mr. Hughes states in his appellate brief that his defense theory was: (1) Ms. Lopez fabricated the charged first and second-degree sexual abuse incidents because (a) she feared her husband who had threatened her about engaging in sexual acts with other men, and (b) she was upset about the incident that caused damage to her knee; and (2) Mr. Hughes's actions constituted "horseplay" in the workplace, and he did not engage in horseplay with employees who communicated that his actions were not welcome.

[8] The not guilty verdicts involving Ms. Lopez were: count 8 (second-degree sexual abuse – oral sex in a pantry), 12 (second-degree sexual abuse

(continued…)

counts 1-3, 6, 10, 13-15, 23, 26A (involving Ms. Lopez); count 16 (relating to Ms. Sanchez), and counts 19-21 (concerning Ms. Mohamud).[9]

## *SEVERANCE*

---

(…continued)
– oral sex in a parking lot), 24-26 (December 3, 2012, misdemeanor sexual abuse – contact between Mr. Hughes's hand and Ms. Lopez's buttocks, third-degree sexual abuse – contact between Mr. Hughes's hand and Ms. Lopez's breast, assault with significant bodily injury – not guilty of the greater offense but guilty of the lesser-included offense of battery assault). The not guilty verdicts involving Ms. Sanchez were: count 17 (attempted misdemeanor sexual abuse – contact between Mr. Hughes's hand and Ms. Sanchez's breast), and 18 (assault – Mr. Hughes's finger in Ms. Sanchez's ear).

[9] The guilty verdicts involving Ms. Lopez were: counts 1-3 (kidnapping, first-degree sexual abuse – penetration of Ms. Lopez's anus, second-degree sexual abuse – penetration of Ms. Lopez's anus), 6 (second-degree sexual abuse – oral sex in the changing room), 10 (second-degree sexual abuse – oral sex in the restroom), 13 (misdemeanor sexual abuse – contact between Mr. Hughes's hand and Ms. Lopez's buttocks), 14 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with towel and Ms. Lopez's buttocks), 15 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with cooking utensil and Ms. Lopez's buttocks), 23 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with clipboard and Ms. Lopez's buttocks), 26A (December 3, 2012, lesser-included offense of battery assault). The guilty verdict pertaining to Ms. Sanchez was count 16 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with a towel and Ms. Sanchez's buttocks). The guilty verdicts relating to Ms. Mohamud were: counts 19 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with a towel and Ms. Mohamud's buttocks), 20 (misdemeanor sexual abuse – contact between Mr. Hughes's hand with a spray bottle filled with bleach and Ms. Mohamud's buttocks), and 21 (destroying property – Ms. Mohamud's pants).

### *The Parties' Appellate Arguments*

As he did in the trial court, Mr. Hughes argues on appeal that the trial court should have severed the counts relating to Ms. Lopez from those pertaining to Ms. Mohamud and Ms. Sanchez, due to prejudicial joinder under Super. Ct. Crim. R. 14. He maintains that the trial court abused its discretion by denying his motion to sever those counts "1) because the evidence of the multiple charges would likely be amalgamated in the jury's mind into a single inculpatory mass; and 2) even if mutually admissible, the negligible probative value of the evidence related to [Ms.] Sanchez and [Ms.] Mohamud would be substantially outweighed by the danger of unfair prejudice." In essence, he complains that the trial court failed to guard against a conviction based upon allegations of his propensity to commit criminal acts. Specifically, he contends that the trial court misunderstood or misapplied precedents of this court and a precedent from the District of Columbia Circuit,[10] and that it "abused its discretion by failing to consider the cumulative effect from its denial of severance based upon an erroneous conflation of a *Drew* exception to support an alleged context of sexual abuse." Moreover, he argues, the trial court "abused its discretion, when having helped to invoke this pretextual environment of

---

[10] The specific precedents are: *Johnson v. United States*, 683 A.2d 1087 (D.C. 1996) (en banc); *Toliver v. United States*, 468 A.2d 958 (D.C. 1983); and *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964).

sexual abuse, it failed to undertake any balancing of the enormous prejudicial effect on Mr. Hughes of its refusal [to sever] against only minimal probative value."

The government responds that Mr. Hughes's context argument under *Johnson* and *Toliver* and his intent argument under *Drew* are subject to plain error review. The government argues that "[t]he trial court . . . did not abuse its discretion when it concluded that the risk of undue prejudice did not substantially outweigh the 'powerful' probative value of the evidence under either the *Johnson/Toliver* or *Drew* rationales." The government further maintains that "[a]ny potential error in denying severance does not rise to the level of reversible error where [as here] evidence of appellant's guilt is strong."

In his reply brief, Mr. Hughes takes issue with the government's plain error argument. He also emphasizes his prejudicial/probative argument and the trial court's and the government's failure to examine the factors outlined in *Johnson*.

### *The Factual Context for the Severance Issue*

Prior to trial, Mr. Hughes filed a motion to sever counts related to Ms. Lopez from those related to Ms. Sanchez and Ms. Mohamud. He mainly argued that "the

government's purpose in joining these counts [was] to create a disposition of criminal propensity regarding Mr. Hughes in the minds of the jury." He contended that the counts were "too similar to keep the offenses separate and distinct." He emphasized the prejudicial impact of the joinder of these counts, arguing that "even if mutually admissible the probative value of the evidence related to [Ms.] Sanchez and [Ms.] Mohamud would be substantially outweighed by the danger of unfair prejudice."

The government opposed Mr. Hughes's motion, contending that joinder was proper under Super. Ct. Crim. R. 8 (a) because the offenses charged are of a similar character. The government argued "that the proffered evidence relating to [the] charges involving [Ms.] Mohamud and [Ms.] Sanchez is properly admissible in a trial of the charges relating to [Ms.] Lopez under *Johnson* and *Toliver*"; that "[e]vidence regarding [Mr. Hughes's] sexual contacts with [Ms.] Mohamud and [Ms.] Sanchez is closely intertwined with the evidence of the crimes involving [Ms.] Lopez, and serves to place the latter crimes, and [Ms.] Lopez's delay in reporting them, in an understandable context"; and that "[w]hen each complainant testifies, these experiences and interactions with [Mr. Hughes] are inextricably linked, as the overall workplace environment sets the context for all of the conduct and each complainant's reluctance to report it." The government contended that "[i]n

addition to being inextricably intertwined with the charged offenses involving [Ms.] Lopez and putting those events in context, the . . . evidence of each offense involving the other victims would be mutually admissible under *Drew* to prove [Mr. Hughes's] intent to use force or to place [the women] in fear, or in the case of the misdemeanors, commit the sexual acts and contacts without their permission, in committing each of the other sexual assaults." Finally, the government asserted that any tendency of the jury to "amalgamate all of the evidence into one mass," as well as any prejudice, could be minimized through a jury instruction indicating that the offense pertaining to each victim, and the evidence, should be considered separately.

In his reply to the government's opposition, Mr. Hughes took issue with the applicability of *Toliver*, arguing that *Toliver* applies to uncharged conduct whereas all of the conduct in this case is charged and therefore the government is proceeding "improperly" with respect to *Toliver*. He contended that "[e]xposed for what it is, the government's conclusion that the presumed 'intertwined' evidence provides an 'understandable context' for all of the charged crimes, in reality, only creates precisely the inference of guilt via propensity that the law forbids." Mr. Hughes reiterated and expounded upon his argument about *Johnson*'s treatment of prejudice, and he asserted that the government "[did] not provide . . . any *Johnson* analysis."

He maintained, also, that the government failed to set forth the proper procedure for a *Drew* analysis. Finally, he contested the government's argument about the minimization of prejudice, declaring that "it fail[ed] to show either the extent of the probative value of the evidence or the extent of unfair prejudice that it inferentially concede[d] need[ed] minimizing."

After hearing argument on the motion to sever, the trial court concluded that the incidents alleged constituted "classic evidence, in terms of the context in which something has happened," and helps to explain "how the women would not have wanted to report [the abuse], and didn't for a long time." Therefore, the evidence was admissible, "under *Johnson* and *Toliver*, with an appropriate limiting instruction." The trial court also determined that the evidence was "also admissible under *Drew*." The court reviewed "[t]he *Drew* factors," including "clear and convincing" evidence, and concluded that the "probative value" of the evidence regarding the charges relating to Ms. Sanchez and Ms. Mohamud was "powerful."[11]

---

[11] During argument on the motion to sever, the trial court said to the prosecutor, "I guess you want to make a proffer, as would normally be done, about using a clear and convincing standard." The prosecutor responded that "the [g]overnment can make the proffer or a detective could testify as to the proffer." However, the government asserted that if it proceeded under *Toliver*, its lead argument, it would not have to satisfy the clear and convincing standard. Defense counsel declared that because the conduct at issue was "charged conduct," allowing the evidence to come in based on a proffer, and despite a clear and convincing

(continued…)

The court acknowledged that "there is prejudice in the pure sense that it's evidence tending to show that [Mr. Hughes] committed the crime," but that the court did not "see" "undue or improper prejudice, or that the prejudice simply outweighs the probative value so that there's a real danger of propensity evidence coming in."

### Standard of Review

Super. Ct. Crim. R. 14 provides, in relevant part that, "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in an indictment . . . or by such joinder for trial together, the [trial] [c]ourt may order . . . separate trials of counts, . . . or provide whatever other relief justice requires." Super. Ct. Crim. R. 14 (2016 ed.). The denial of a motion under Rule 14 to sever counts "will not be reversed on appeal unless the defendant can convince this court that there was a clear abuse of [the trial court's] discretion." *Arnold v. United States*, 511 A.2d 399, 404

---

(…continued)
standard, could result in the jury deciding that based on the proffer, "we think he did the other crime too, which can occur with other crimes evidence." Although the trial court, defense counsel, and the prosecutor continued their discussion, it does not appear that the government ever made a proffer under the clear and convincing standard. Rather, the trial court simply stated, if the government's "evidence evolves as has been proffered through pleadings here, it would clearly go to Mr. Hughes's intent to use force in a sexual act context."

(D.C. 1986) (citations omitted); *see also Bates v. United States*, 51 A.3d 501, 506 (D.C. 2012).

Super. Ct. Crim. R. 8 (a) permits the joinder of offenses for, "felonies or misdemeanors, or both," if they "are of the same or similar character." Super. Ct. Crim. R. 8 (a). "When joinder is based on the 'similar character' of the offenses, a motion to sever should be granted unless (1) the evidence as to each offense is separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass, *or* (2) the evidence of each of the joined crimes would be admissible at the separate trial of the others." *Arnold*, *supra*, 511 A.2d at 404-05 (internal quotation marks and citation omitted) (emphasis in original); *see also Drew*, *supra*, 331 F.2d at 91 (noting that there is "no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials"). To convince this court to reverse a denial of a motion for severance under Rule 14, "the defendant must show the most compelling prejudice . . . from which the [trial] court would be unable to afford protection if both offenses were tried together . . . ." *Arnold*, *supra*, 511 A.2d at 404 (internal quotation marks omitted). "[T]he trial court's discretionary judgment regarding whether to grant a severance motion is entitled to great

deference." *Bates*, *supra*, 51 A.3d at 506 (internal quotation marks omitted) (citing *Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010)).

### *Applicable Legal Principles*

The government's theory in the trial court, which is advanced on appeal, was that the evidence of each charged crime would be admissible at the separate trial of the other charged crime; that is, the evidence would be mutually admissible. For example, if the first-degree sexual abuse charges – oral sex and penetration – (force with aggravating circumstances) were tried separately, evidence of each of the misdemeanor sexual abuse events, as well as evidence regarding destruction of Ms. Mohamud's property would be admissible at that trial. Similarly, if the misdemeanor sexual abuse charges, or the destroying property charge concerning Ms. Mohamud were tried separately, evidence of the first-degree sexual abuse events would be admissible at those trials. To support its mutual admissibility theory, the government further relied on legal principles articulated in *Toliver* and *Johnson*, and in the alternative, *Drew*.

In analyzing the parties' severance arguments on appeal, we are guided by the following legal principles. The fundamental principle is "that evidence of one

crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew*, *supra*, 331 F.2d at 89. To avoid "an improper inference" of criminal disposition, "courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose." *Id*. at 89-90. "The same dangers appear to exist when two crimes are joined for trial, and the same principles of prophylaxis are applicable." *Id*. at 90. Thus, the same principle applies when the consideration is "the admissibility of evidence of one charged crime in a trial with another charged crime." *Holiday v. United States*, 683 A.2d 61, 82 (D.C. 1996).

One substantial, legitimate purpose in admitting evidence of other crimes (uncharged or charged) is "to explain the immediate circumstances surrounding the offense charged," that is, to "plac[e] in context and mak[e] comprehensible to the jury the circumstances surrounding the charged offense." *Toliver*, *supra*, 468 A.2d at 960-61. Moreover, "in cases where evidence of incidental, uncharged criminal conduct is inextricably intertwined with evidence of the charged offense, evidence of the uncharged criminal conduct is directly admissible without the necessity of a cautionary *Drew* instruction." *Id*. at 961. "[U]nder *Toliver*, the question is whether evidence of each charged crime is part of the 'immediate circumstances surrounding' the other, such that the evidence reflects [separate events] so

'intimately entangled' that . . . each criminal event is not clearly explainable to the jury without evidence of the other." *Holiday*, *supra*, 683 A.2d at 82; *see also Johnson*, *supra*, 683 A.2d at 1098 ("*Drew* does not apply where . . . evidence . . . is closely intertwined with the evidence of the charged crime, or . . . is necessary to place the charged crime in an understandable context.").

*Johnson* instructs, also, that *Drew* is not a bar to the admission of other crimes evidence if it "is direct and substantial proof of the charged crime." 683 A.2d at 1098. However, if evidence is to be admitted under *Toliver* or *Johnson*, it must pass "the balancing [test] of probative value against the potential for unfair prejudice." *Id.* Under that test "evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 1099.

Aside from its fundamental principle regarding evidence of criminal disposition, *Drew* articulates another substantial, legitimate purpose for admitting other crimes evidence: "[e]vidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other …, and (5) the identity of the person charged with the commission of the crime on trial."

331 F.2d at 90. Significantly, "[w]hen the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value." *Id.* Nevertheless,

> [b]efore evidence of other offenses probative of any of the allowable issues may be admitted, a trial court is required to find: i) that the defendant committed the other offenses by clear and convincing evidence; ii) that the evidence of the other offenses is directed to a genuine, material and contested issue in the case; iii) that the evidence is relevant to the issue beyond demonstrating the defendant's criminal propensity; and iv) that the evidence is not more prejudicial than probative.

*Parker v. United States*, 751 A.2d 943, 948 n.14 (D.C. 2000) (citation omitted).

### *Discussion*

Mr. Hughes's vigorous argument that *Toliver* applies only to the admissibility of *uncharged* criminal conduct and is not applicable to this case of *charged* crimes against Ms. Lopez and against Ms. Mohamud and Ms. Sanchez, is unavailing. This court considered a severance issue and arguments based on *Toliver* in *Holiday*, *supra*, a case involving charged crimes – distribution of cocaine and weapons offenses pertaining to a gun. 683 A.2d at 64-65. We recognized that *Toliver* "dealt with the issue of admissibility of uncharged criminal activity in a case of

another charged crime," *id*. at 82, but that *Holiday* presented the issue of "the admissibility of evidence of one charged crime in a trial with another charged crime." *Id*. "Thus, the question of inextricable linkage of the two for *Toliver* purposes is a question of mutual inextricable linkage — *i.e.*, linkage as seen from the perspective of each offense at the time that it occurred — much like mutual admissibility under a *Drew* analysis." *Id*. Stated another way, "the question is whether the evidence of each charged crime is part of the 'immediate circumstances surrounding' the other, such that the evidence reflects two transactions (or a series of transactions) so 'intimately entangled' that . . . each criminal event is not clearly explainable to the jury without evidence of the other." *Id*. Similarly, the question in Mr. Hughes's case is whether charged events concerning Ms. Lopez are inextricably linked to the charged events involving Ms. Mohamud and Ms. Sanchez, that is, whether what happened to Ms. Lopez at the hands of Mr. Hughes is not clearly explainable to the jury without the evidence as to what happened to Ms. Mohamud and Ms. Sanchez at Mr. Hughes's hands.

Given the evidence presented by the government regarding Mr. Hughes's behavior in the workplace at NAC and Mr. Hughes's essential defenses that his actions constituted horseplay and that Ms. Lopez fabricated the more serious allegations of sexual abuse (penetration and oral sex), the evidence about 1) the fear

of the women that they would be fired and Mr. Hughes's categorical insistence that the women could not speak to someone higher in the FAME Corporation, 2) the women's assertions that they did not want Mr. Hughes to touch them sexually, and 3) Mr. Hughes's repeated sexual contact with the women while they were working under his supervision, inextricably linked the charges involving the three women. Moreover, the charges concerning each of the women were not clearly explainable to the jury without evidence of the other. In short, the evidence of each charged crime was part of the "immediate circumstances surrounding the other[s]," was "necessary to place the charged crime in an understandable context," and was "closely intertwined with the evidence of [each] charged crime." *Holiday*, *supra*, 683 A.2d at 82 (internal quotation marks omitted); *Johnson*, *supra*, 683 A.2d at 1098.

Although we conclude that there is mutual inextricable linkage of the charged crimes concerning Ms. Lopez, Ms. Sanchez, and Ms. Mohamud, we must address another critical inquiry under *Toliver* and *Johnson* – whether Mr. Hughes has shown "the most compelling prejudice . . . from which the [trial] court would be unable to afford protection" if the charged offenses relating to Ms. Sanchez and Ms. Mohamud respectively were tried together with the charged offenses relating to Ms. Lopez. *Arnold*, *supra*, 511 A.2d at 404. We discern no compelling prejudice, in a trial of the Lopez charged crimes, resulting from the introduction of evidence of Mr.

Hughes's misdemeanor sexual contact with Ms. Mohamud and Ms. Sanchez under *Toliver*. Based on our review of the evidence in this case, we see no extreme risk that Mr. Hughes would be convicted of the serious and heinous first and second degree sexual abuse charges (accomplished with force and aggravating circumstances), or the other serious crimes, because of evidence of events relating to Ms. Mohamud and Ms. Sanchez. We think it unlikely that a reasonable jury would infer a criminal disposition on Mr. Hughes's part to commit first- and second-degree sexual abuse and kidnapping, solely on the basis of the misdemeanor conduct pertaining to Ms. Sanchez and Ms. Mohamud.

We reach a different conclusion with respect to the introduction of the evidence of the serious Lopez charged events at separate trials of the charged crimes pertaining to Ms. Mohamud and Ms. Sanchez. The probative value of the evidence of Ms. Lopez's kidnapping, first- and second-degree sexual abuse, and significant bodily injury would be substantially outweighed by the danger of unfair prejudice in a separate trial of the three misdemeanor sexual contact counts relating to Ms. Sanchez, and a separate trial of the two misdemeanor sexual contacts counts and the destroying property (pants with bleach) count relating to Ms. Mohamud. We are persuaded that no cautionary jury instruction could avoid "an extreme risk of

prejudice." *Bright v. United States*, 698 A.2d 450, 456 (citing *Parks v. United States*, 656 A.2d 1137, 1140 (D.C. 1995)).

If the Lopez evidence were introduced at the separate misdemeanor trials involving events pertaining to Ms. Sanchez and Ms. Mohamud, the jury would be left with images of Mr. Hughes's forceful penetration of Ms. Lopez's anus, or his equally heinous insertion of his private part into Ms. Lopez's mouth, and the jury might well convict Mr. Hughes because of its perceived view that he had a criminal disposition to commit the misdemeanor offenses. In a case where a defendant is being tried for far less serious conduct, such as the misdemeanor offenses at issue in this case and in *Parks*, the prejudicial effect of introducing evidence of graphic and far more serious other crimes can "dwarf[]" any legitimate value the evidence might have. *Parks*, *supra*, 656 A.2d at 1140. In short, the risk here – that evidence about Mr. Hughes's violation of Ms. Lopez would influence or impact the jury's evaluation of the evidence concerning the respective cases relating to Ms. Sanchez and Ms. Mohamud – was "overwhelming." *Id*. We acknowledge that the jury in this case actually acquitted Mr. Hughes of two counts of misdemeanor sexual abuse relating to Ms. Sanchez, perhaps suggesting that there was no risk of prejudice due to the joinder of all of the offenses. Nevertheless, we cannot be sure, that the jury would not have convicted Mr. Hughes of the Sanchez and Mohamed charges based

on the conclusion that he had the criminal disposition to commit these offenses due solely to the evidence of the Lopez sexual acts committed by Mr. Hughes. Put another way, we are not satisfied that the trial court properly weighed the probative value against the risk of prejudice and we are not persuaded that the error was harmless, that is, that the judgment "was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

In sum, we conclude that in a separate trial of the Sanchez and Mohamud charged offenses, respectively, introduction of evidence pertaining to the Lopez charged offenses posed an extreme and unacceptable risk of prejudice from which no limiting jury instruction could protect Mr. Hughes. Therefore, the trial court abused its discretion in failing to sever the Mohamud and Sanchez misdemeanor counts and we are constrained to reverse Mr. Hughes's Sanchez misdemeanor conviction (count 16 – contact between Mr. Hughes's hand with towel and Ms. Sanchez's buttocks). In addition, we reverse the three Mohamud convictions (count 19 – contact between Mr. Hughes's hand with towel and Ms. Mohamud's buttocks; count 20 – contact between Mr. Hughes's hand with spray bottle of bleach and Ms. Mohamud's buttocks; and count 21 – destroying property – Ms. Mohamud's pants). However, since we are convinced that the same extreme and unacceptable risk would not be present if evidence of the charged Sanchez and

Mohamud offenses were introduced in a separate trial of the Lopez charged crimes, we will affirm those convictions if we decide that the evidence was sufficient to sustain those convictions beyond a reasonable doubt. *See Parks*, *supra*, 656 A.2d at 1140-41 (referencing *Settles v. United States*, 522 A.2d 348, 354 (D.C. 1987)) ("[M]isjoinder 'may be partially harmless and require only a partial reversal' where 'offense B may be inadmissible in a trial for offense A, but offense A may be admissible in a trial for offense B.'"); *Bright*, *supra*, 698 A.2d at 459 (this court reversed an unlawful possession of ammunition conviction but affirmed first-degree murder while armed convictions and a conviction on charge of carrying a pistol without a license).[12]

### *SUFFICIENCY OF THE EVIDENCE*

#### *The Parties' Arguments*

Mr. Hughes contends that his first-degree sexual abuse conviction (penetration of anus) must be reversed because the government failed to "prove beyond a reasonable doubt that Mr. Hughes used force against Ms. Lopez." He

---

[12] Given our conclusions relative to *Toliver* and *Johnson*, we deem it unnecessary to consider the parties' arguments pertaining to the government's alternative *Drew* theory.

claims that Ms. Mohamud did not hear Ms. Lopez scream, Ms. Lopez "often flirted with Mr. Hughes," and "she voluntarily touched him."

With respect to his second-degree sexual abuse convictions (penetration of anus and oral sex) Mr. Hughes argues that the government failed "to prove that Ms. Lopez's alleged fear [of being fired] was a *reasonable* fear as required by statute," and "that any fear Ms. Lopez had over her relationship with Mr. Hughes was a fear of her husband's reaction to finding out about her close, personal relationship with Mr. Hughes."  Mr. Hughes also maintains that the government failed to prove the "confinement or restraint" element of kidnapping, in part because Ms. Mohamud heard no screams by Ms. Lopez and because there were no locks on the doors where the alleged sexual abuse took place.  As for the misdemeanor convictions, Mr. Hughes asserts that the government's proof failed to show anything more than horseplay when Mr. Hughes used the towel or other objects, and that he stopped when the employees asked him to do so.  He contends that the evidence "simply does not support the jury coming to a factual conclusion, beyond a reasonable doubt, that the[] mutual contacts [between Mr. Hughes and Ms. Lopez] were not wanted by Ms. Lopez."

The government responds that it satisfied the force element of first-degree sexual abuse through the testimony of Ms. Lopez that Mr. Hughes grabbed her by the hair, pushed her in the changing room, and forcibly pulled down her pants twice. The government further maintains that no corroboration is necessary, and that Ms. Lopez's testimony is not "inherently incredible." Moreover, the government argues, any playful conduct at other times "cannot disprove, as a matter of law, [Ms.] Lopez's testimony that [Mr. Hughes] sexually abused her by force." With respect to the kidnapping conviction, the government contends that it met the confinement or restraint requirement through testimony about Mr. Hughes grabbing Ms. Lopez's hair and pushing her to hold her. Finally the government asserts that even though Ms. Lopez and Ms. Sanchez told Mr. Hughes not to hit them on the buttocks any more, he continued to do so, and that in Ms. Mohamud's case, he sprayed her buttocks with bleach after she told him not to hit her again with the towel.

### *Standard of Review*

Our review of sufficiency claims is *de novo*. *Brown v. United States*, 146 A.3d 110, 112 (D.C. 2016). "We view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Id.* (internal quotation marks and

citation omitted). Appellant bears a heavy burden to convince the court to reverse a conviction on sufficiency grounds. "Reversal of a conviction on insufficient evidence grounds can only be ordered when the government . . . produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Koonce v. United States*, 993 A.2d 544, 551 (D.C. 2010) (internal quotation marks and citation omitted). "[W]hether the evidence is persuasive is a determination left to the jury, and [i]t is axiomatic, that as assessors of a witness' credibility, the jury is always free to accept parts of a witness' testimony and reject other parts." *Id*. (internal quotation marks omitted). Moreover, "contradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence." *Id*. (internal quotation marks and citation omitted).

### *Discussion*

We are not persuaded by any of Mr. Hughes's sufficiency of the evidence arguments. First-degree sexual abuse requires proof that a person "causes another person to be engaged in . . . a sexual act . . . [b]y using force against that other person." *Blair v. United States*, 114 A.3d 960, 977 (D.C. 2015) (citing D.C. Code § 22-3002 (a)(1) (2012 Repl.)). The government introduced compelling evidence, through the testimony of Ms. Lopez, that while other employees were on break, Mr.

Hughes grabbed her by the hair as she was walking to the refrigerator, pushed her toward the changing room, tried to pull down her pants and forced them down when Ms. Lopez pulled them up. He asked her if she wanted to lose her job and then forced his private part into her anus. This compelling testimony, if believed and credited by the jury, as occurred here, satisfied the fear element of the statute beyond a reasonable doubt.

"Under [D.C. Code] § 22-3003 (1), a person commits second degree sexual abuse if he 'engages in or causes another person to engage in or submit to a sexual act . . . [b]y threatening or placing that other person in reasonable fear (other than by threatening or placing that other person in reasonable fear that any person will be subjected to death, bodily injury, or kidnapping.)'". *Way v. United States*, 982 A.2d 1135, 1136-37 (D.C. 2009). In *Way*, a second-degree sexual abuse case involving a prostitute and appellant who was dressed in his "full police uniform," we said that the "reasonable fear" was the fear of arrest. *Id*. at 1135, 1137. In this case, the government's ample and strong proof showed that Ms. Lopez was in reasonable fear of being fired. Indeed, Ms. Lopez testified that Mr. Hughes would threaten to fire her if she did not do what he wanted. On one occasion Mr. Hughes ordered Ms. Lopez to meet him in the restroom. When she did not comply, he again approached her and asked, "do you want me to fire you? Do you want to lose your job?" If the

jury believed that testimony, as it obviously did, the government satisfied the element of "reasonable fear." Moreover, while the jury may well have believed that Ms. Lopez was afraid that her husband would find out that she had sex with Mr. Hughes, the jury could simultaneously believe that Ms. Lopez was afraid of losing her job and being able to support her family if she did not comply with Mr. Hughes's sexual demands.

Under D.C. Code § 22-2001, a person is guilty of kidnapping if he "seiz[es], confin[es] . . . and hold[s] or detain[s] . . . [an] individual for ransom or reward or otherwise . . . ." D.C. Code § 22-2001 (2012 Repl.). "[T]he essence of the crime of kidnapping" is "[t]he involuntary nature of the seizure and detention." *Pearsall v. United States*, 812 A.2d 953, 963 (D.C. 2002). In this case, there was strong and compelling evidence, presented through the testimony of Ms. Lopez, that she was detained against her will by Mr. Hughes. Mr. Hughes's acts of grabbing Ms. Lopez by the hair and pushing her toward the changing room indicate she was seized and detained involuntarily by Mr. Hughes.

Finally, D.C. Code § 22-3006 provides that "[m]isdemeanor sexual abuse occurs when a person 'engages in a sexual act or sexual contact with another person' with 'knowledge or reason to know that the act was committed without that other

person's permission[.]'" *Pinckney v. United States*, 906 A.2d 301, 305 (D.C. 2006) (citing D.C. Code § 22-3006). We conclude that Mr. Hughes has not satisfied his heavy burden to show that the government "produced no evidence from which a reasonable mind might fairly infer [his] guilt beyond a reasonable doubt." *Koonce*, *supra*, 993 A.2d at 551. It is true that Ms. Lopez laughed at times when Mr. Hughes hit her on the buttocks, but reasonable jurors could justifiably credit her testimony that she laughed at times because she did not know "what to do," that sometimes Mr. Hughes would hit her so hard with the rolled-up wet towel or the spatula that she would "run and get ice" and that the impacted area "would get red or swollen." Reasonable jurors also could credit Ms. Lopez's testimony that Mr. Hughes hit her so hard with a clipboard on December 3, 2012, that she screamed and said she would "kick his butt" if he did it again. From these incidents, reasonable jurors could reasonably and justifiably infer that Mr. Hughes did not have Ms. Lopez's permission to hit her on the buttocks, with his hand or other objects, and that his conduct was unwanted.

Accordingly, for the foregoing reasons, we affirm the trial court's judgment relating to Mr. Hughes's convictions on the Lopez charges. However, we reverse the trial court's judgment with respect to Mr. Hughes's convictions on Sanchez count 16, and his convictions on Mohamud counts 19, 20, and 21, and remand those counts to the trial court for a new trial.

*So ordered*.